UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,
ex rel SIMEON ANDERSON,
SIMEON ANDERSON on behalf
of himself and others similarly situated (PLAINTIFF CLASS),
STATE OF MICHIGAN,
ex rel SIMEON ANDERSON

Case No.
Hon.

Plaintiffs,

vs.                                    **CLASS ACTION COMPLAINT**

CONSUMERS ENERGY COMPANY,
a Michigan Corporation, for profit,
DIANE Y. BOWER in her individual and official capacity
ERIC KEATON in his individual and official capacity
HUBERT MILLER in his individual and official capacity
WAYNE LEJA in his individual and official capacity
STEVE STUBLESKI in his individual and official capacity
MICHAEL TORREY in his individual and official capacity
JAMES FRAGA in his individual and official capacity
ANNE ROGUS in her individual and official capacity
CURT PUCKETT in his individual and official capacity
jointly and severally,
                        Defendants.
_____/

RAYMOND GUZALL III (P60980)
RAYMOND GUZALL III, P.C.
Attorney for Plaintiff ex rel Anderson and class
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248) 702-6122
rayguzall@attorneyguzall.com
_____/

**THIS CASE MUST BE FILED UNDER SEAL**
**AND SHOULD NOT BE MADE PUBLIC**
**UNTIL ORDERED BY THIS COURT**
There is pending civil action arising out of a part of the transaction or occurrence alleged
in this complaint, in the Circuit Court for the County of Jackson Michigan, Case No. 12-
2235-CD before Judge John G. McBain, yet, that case does not deal with the False
Claims Act nor the hundred(s) of millions of dollars that Defendant Consumers Energy
has defrauded the U. S. Government, State of Michigan and Plaintiff Class.

**VERIFIED COMPLAINT AND DEMAND FOR JURY**

1

NOW COME Plaintiff's, UNITED STATES OF AMERICA, ex rel SIMEON ANDERSON, SIMEON ANDERSON on behalf of himself and others similarly situated (Plaintiff Class), STATE OF MICHIGAN and ex rel SIMEON ANDERSON SIMEON ANDERSON, by and through attorney, Raymond Guzall III, P.C., by Raymond Guzall III, and hereby complain against CONSUMERS ENERGY COMPANY, and DIANE Y. BOWER in her individual and official capacity, ERIC KEATON in his individual and official capacity HUBERT MILLER in his individual and official capacity WAYNE LEJA in his individual and official capacity STEVE STUBLESKI in his individual and official capacity, MICHAEL TORREY in his individual and official capacity, JAMES FRAGA in his individual and official capacity, ANNE ROGUS in her individual and official capacity and CURT PUCKETT in his individual and official capacity jointly and severally as follows:

## COUNT I
## VIOLATION OF FEDERAL FALSE CLAIMS ACT qui tam and (RICO) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

1.  That at all times pertinent hereto, Plaintiff, SIMEON ANDERSON, was employed by CONSUMERS ENERGY COMPANY, in Jackson County, State of Michigan.

2.  Defendant Consumers Energy Company (herein referred to as Consumers Energy and/or Defendant) is a Michigan Corporation, for profit, with an address of One Energy Plaza EP1-420, Jackson, Michigan, 49201.

3.  The Resident Agent for Consumers Energy Company is Catherine M. Reynolds, at One Energy Plaza EP1-420, Jackson, Michigan, 49201.

4.   Plaintiff Anderson began his employment with Consumers Energy on or about July 18, 2011.

5.   Plaintiff Anderson was qualified for the position he was hired for by Consumers Energy.

6.   Plaintiff Anderson worked for Consumers Energy in Jackson County Michigan in office 12-445.

7.   Plaintiff Anderson has a Bachelor degree from Dartmouth in Economics and Math (Statistics).

8.   Plaintiff Anderson has a Masters degree from the University of Michigan in Architecture and a Masters degree from the University of Michigan in Construction Engineering and Management.

9.   Plaintiff Anderson was appointed to the load research supervisor after approximately 2 weeks on the job at Consumers Energy.

10.  Plaintiff Anderson worked as an employee of Defendant Consumers Energy for approximately 9 months.

11.  Plaintiff Anderson was wrongfully terminated from Defendant Consumers Energy on or about May 2, 2012.

12.  Plaintiff Anderson filed a lawsuit against Consumers Energy in the Circuit Court for the County of Jackson Michigan, Case No. 12-2235-CD before Judge John G. McBain, alleging that he was fired because he would not agree to go along with the fraud that Consumers Energy was engaged in (Whistle Blower Complaint), among other causes of action.

13.   Plaintiff Anderson, as part of his job while working at Consumers Energy, downloaded over 700 million pages of data, which supports his allegations in his lawsuit in Jackson County Circuit Court in Michigan, and in this lawsuit.

14.   Plaintiff Anderson filed a complaint with the Michigan Public Service Commission, case number U-17062, as a customer of defendant Consumers Energy, requesting an investigation into the defendant company's fraudulently derived electricity rates based upon his knowledge of the defendant company's internal cost of service and load research operations and review of this downloaded data.

15.   Plaintiff Anderson supplied those records to the Michigan Public Service Commission (MPSC) upon his termination from Defendant Consumers Energy.

16.   The Attorneys for the Michigan Public Service Commission (MPSC) have indicated that Plaintiff Anderson's complaint to them has flushed out what they were hoping to find, which was some evidence of fraud on the part of Consumers Energy in determining actual and expected costs and cost allocation schedules used to derive electricity rates and other related charges in their rate cases, regulatory filings and rate proceedings at the MPSC.

17.   It has been explained to Plaintiff Anderson and his Counsel by those at the MPSC and Michigan Attorney General's Office that the MPSC, cannot go back in time however and hold Consumers Energy monetarily responsible for the past acts of fraud by Consumers Energy, but they can only deal with future rate cases involving Consumers Energy.

4

18.     During the pendency of Plaintiff Anderson's lawsuit in Jackson Michigan, he has been able to uncover proof that Defendant Consumers Energy has committed fraud against the United States Government with particularity and specificity that he was unable to do previously, and was unaware of previously.

19.     Plaintiff had to review nearly a terabyte of data in order to finally come to the conclusions within this Complaint.

20.     Defendant violated 31 U.S.C.A. § 3729, the False Claims Act, by defrauding Plaintiff, the United States Government out of billions of dollars, as explained herein.

21.     This Court has jurisdiction over this matter based upon Plaintiffs' claim that Defendant violated 31 U.S.C.A. § 3729, the False Claims Act, along with other federal claims herein, and pursuant to 28 U.S.C.A. § 1331, federal question.

22.     From the year 2009 (and before) to the year 2012, Defendant Consumers Energy has fraudulently obtained more than $3 Billion from its rate payers, the federal government of the United States, the citizens of the state of Michigan (Plaintiff Anderson and the Class) and the State of Michigan.

23.     According to its own records, Consumers Energy has also obtained excessive revenues through the use of fraud as far back as 1997.

24.     Consumers Energy and other co-conspirators engaged in the illegal act of fraud against the United States Government in violation of 18 U.S.C.A. § 371 (RICO) Racketeer Influenced and Corrupt Organizations Act, and 26 USCA 7201, and other applicable law as shown herein, and is believed to be still engaging in that fraud.  (See Exhibit 1, attached list of co-conspirators).

25.   "Unlike the general conspiracy statute, § 1962(d) requires no "overt or specific act" in carrying the RICO enterprise forward. Furthermore, "the supporters are as guilty as the perpetrators ... so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." *United States v Corrado*, 286 F3d 934, 937 (CA 6 2002), citations omitted.

26.   Defendant Consumers Energy, it's employees, agents and co-conspirators did knowingly operate and facilitate a scheme which included the operation and/or management of a RICO enterprise, and shared the common purpose in bilking the U. S. Federal Government, the State of Michigan, customers of Consumers Energy (the Class), and possibly others, out of billions of dollars to their monetary gain, as specified herein.

27.   The conduct of the enterprise through a pattern of racketeering activity is specified herein.

28.   "RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (defining an enterprise as a "group of persons associated together for a common purpose of engaging in a course of conduct")." *Fremont Reorganizing Corp v Duke*, 811 F Supp 2d 1323, 1336 (ED Mich 2011), *reconsideration den* 10-11923, 2011 WL 5024573 (October 20, 2011).

29.   The law states Defendants may be punished accordingly, "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or

6

the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution." *26 USCA 7201.*

30.    The law states Defendants may be punished accordingly, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." *18 USCA 371.*

31.    The laws states Defendants may be punished accordingly; "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." *15 USCA 1*

32.    Defendant Wayne Leja is employed by Defendant Consumers Energy in Revenue Requirements and was complicit in the fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and the concert of actions against Plaintiffs.

33.   Defendant James Fraga is employed by Defendant Consumers Energy in Revenue Requirements and was complicit in the fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

34.   Defendant Eric Keaton is employed by Defendant Consumers Energy in Cost of Service and was complicit in the fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

35.   Defendant Hubert Miller is employed by Defendant Consumers Energy and was complicit in the fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

36.   Defendant Steve Stubleski is employed by Defendant Consumers Energy as the director for Pricing, Rate Adminstration and Cost of Service and was complicit in the fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

37.   Defendant Anne Rogus is employed by Defendant Consumers Energy as the director of Revenue Requirements and was complicit in the fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

38.   Defendant Michael Torrey is employed by Defendant Consumers Energy as the executive director of rates and was complicit in the fraud against Plaintiffs and

covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

39.     Defendant Curt Puckett as a principal of RLW Analytics was complicit with Defendant Consumers Energy in fraud against Plaintiffs and covering up the fraud against Plaintiffs, as well as complicit in the conspiracy and concert of actions against Plaintiffs.

## COUNT II
## FRAUD - INTENTIONAL AND/OR CONSTRUCTIVE FRAUD, and CONSPIRACY AND CONCERT OF ACTIONS

40.     Plaintiffs re-allege and incorporate Paragraphs 1 through 39 as though set forth in full word for word and paragraph for paragraph.

41.     Customer Classes and the MPSC were defrauded as follows:

i)  In its rate cases, testimony, audit and discovery responses and other regulatory filings submitted to the MPSC, Defendant Consumers Energy falsified the actual amount of electricity (herein referred to as electric energy, billed sales, sales, or energy (kwh), depending on context), delivered, sold and supplied to residential customers (**Customer Class—Residential**), including those residential customers who are served through alternative Energy suppliers and those who are subject to FERC (Federal Energy Regulatory Commission) Open Access Transmission Tariff (OATT) provisions and regulations.  And, the Defendant falsified when that electricity was used-delivered and the respective demands as well.

9

ii) In its rate cases, testimony, audit and discovery responses and other regulatory filings submitted to the MPSC, Defendant Consumers Energy falsified the actual amount of electricity delivered, sold and supplied to small commercial and industrial business customers **(Customer Class— Secondary**, includes businesses such as McDonalds, Wendy's, barbershops, small stores, etcetera) including those secondary customers who are served through alternative Energy suppliers and those who are subject to FERC (Federal Energy Regulatory Commission) Open Access Transmission Tariff (OATT) provisions and regulations. And, the Defendants falsified when that electricity was used-delivered and the respective demands as well.

iii) In its rate cases, testimony, audit and discovery responses and other regulatory filings submitted to the MPSC, Defendant Consumers Energy falsified the actual amount of electricity delivered, sold and supplied to large commercial and industrial business customers (**Customer Class—Primary**, includes businesses such as General Motors plants, its headquarters, Metal Melting facilities, Wal-Mart's, factories, etcetera), including those primary customers who are served through alternative Energy suppliers and those who are subject to FERC (Federal Energy Regulatory Commission) Open Access Transmission Tariff (OATT) provisions and regulations. And, the defendant falsified when that electricity was used-delivered and the respective demands as well.

iv) Correspondingly, in its rate cases, testimony, audit and discovery responses and other regulatory filings submitted to the MPSC, Defendant Consumers Energy falsified the delivery and production levels of electricity for its customers.

(As defined by applicable law, the Sales Revenues of an electric utility company are really a recovery of practically all of its costs or expenses, as approved by regulators, through cost-based electricity rates. Or, it is the amount of money the utility receives from charging the approved rates to the respective groups of customers. An approved "return on rate base" (i.e., the amount of money needed to cover the cost of funds invested in rate base—rate base is defined as working capital allowance and the dollar value all of the MPSC approved plants and equipment used to supply electricity to jurisdictional (or non-wholesale or non-interchange customers) electric customers) is considered to be a cost that a power company can collect through electricity rates as well.

By law, Defendant Consumers Energy is required to develop a cost of service study (COSS), using load research, accounting and other records related to its electric system location and performance, in order to analyze and attribute costs to various categories of customers based on how those customers caused the costs to be incurred. The Cost of Service Study is also used to determine how costs will be recovered from customers within each class, determine the amount of money it needs from each class, in order to offer various types of services, and separate the defendant company's costs between regulatory jurisdictions.

In general, the more electricity you sell the more costs you incur, even if at a declining rate.  However, in certain scenarios, even if a customer class does not use more electricity overall, if they use electricity during the times of the day and-or year when it is more expensive to produce and-or purchase power, costs are still increased.  Where it becomes necessary to replace, at a higher cost, and add additional plant and-or equipment to serve electric customers, the rate base and consequently the Net operating income, expands costs as well.  In terms of developing electricity rates and other related charges, understanding when and how much electricity each customer class uses is one of the most critical functions of a load research department as it is the basis for developing cost allocation schedules and the underlying key statistics.

By law, cost based electricity rates are designed so that each class pays for its own costs.  Or put another way, each class of customers pays the costs it caused to be imposed upon various portions the company's electric system.  Analyzing how much and when electricity is used and by whom (which customer class), is the basis for the company allocating various costs to customer classes based upon the respective portions of costs they caused.  The sum of various amounts of money required to provide electricity to each class is equal to the "total" revenue requirement of the company.

By falsifying the sales, delivery levels and demands of each customer class and matching the fraudulently developed system energy output and demands with these manufactured "totalized" figures, the defendant falsified their costs and the

12

cost allocation schedules used in developing their electricity rates and other related charges for all of its customer classes.

Generally, "regular" or energy only meters are installed to count how much electricity an electric customer uses from month to month or from one billing cycle to the next, approximately 30 days in between. The calculation is made as one might expect. Theoretically, the last "read" taken from the meter on the last day of January would be the starting point for counting the amount of electricity used by an electric customer during the month of February. The read taken from the meter on the last day of February would be the end point and the amount of energy used by a customer is determined by subtracting the starting point from the endpoint. Theoretically, the resulting difference would give you the total amount of energy used by and charged to the customer for the month of February.

This aggregate figure simply gives a lump sum. It does not give any information about when the electricity was used or how much was used at different times during each 24-hour period of that month. Although most customers have these simpler types of meters, other customers who are a part of the sample (or those who have demand meters installed) have special meters—called mv90 meters and-or interval meters—which record exactly how much electricity the customer uses during each interval on a continuous basis throughout each hour, day and night of the entire year.

With interval meters, defendant Consumers Energy records how much electricity or the rate at which it is used-delivered minute by minute or instantaneously. Under normal circumstances, after the necessary calculations have been made using the "raw" data taken from the meters, the company retrieves the amount of energy used in 15-minute intervals and presents the results hour by hour, by adding the amounts recorded during the four 15-minute periods of the hour for each day—or 24 hour period and-or 25 hour period for the respective daylight savings time occurrence—of the year. This hourly record that is compiled for an entire year is called an electric load profile (herein referred to as a load profile, load curve, load shape, consumption pattern or an 8760 report, i.e., 24 hours/day x 365 day/year = 8,760 hours). In general, for a residential customer, the consumption pattern shows that an average customer uses more energy during the morning hours, before leaving for school or work, and during the evening hours, when a customer typically turns on the stove, TV, and-or computer, than during the parts of the day when most people are at work, or from 8 AM to 5 PM. The load profile for other customer classes—i.e., Secondary and Primary—vary according to business type and schedule. The load shape may vary among residential customers, but for the "average" residential customer, generally, this expected pattern is delineated in the varying amount of electricity recorded hour by hour.

At the end of the year (or for the desired period, i.e., daily, weekly, or monthly), this hour by hour report, which is compiled for each customer in the respective

14

class samples or in the respective business department, is used to develop an "average" load profile for each sampled rate.   For purposes of determining electricity rates and other related charges, it is assumed that every customer in the *sampled* class behaves like an "average" customer (a "weighted" average takes into account the various changes in the load pattern caused by differences in appliances such as electric space heating, air conditioning, and-or electric water heating and is "built into" the load profile).

Looking at the 2010 residential sample, the average load profile for the class is calculated using the following steps.   If we determine that there are 1,000 customers in the residential sample, the load profile is developed by adding up the amount of electricity that each customer from the 1,000 person sample used, starting with hour 1 of the first day of January 2010.   **(The amounts recorded for each hour for each *individual* customer in the sample by defendant Consumers Energy included extraordinary figures to the tune of 1,000 to more than 9,000 times more than what it should have been for *individual* residential customers.   And, the defendant company added phony accounts to the annual and monthly "sapbilling2009, sapbilling2010, and so on" files, used to develop sales figures reported to the MPSC, in order to make the respective class energy totals and-or demands estimated from the sample correspond with the respective sales figures.)**   After adding up the total amount used from 12 AM to 1 AM on January 1, 2010, you divide this sum by the number of customers in the sample, or by the number 1,000.   Next,

15

this is done for the remaining 8,759 hours of year 2010. Each 8,760 hourly average calculated from the sample is plotted on a graph or compiled in an excel spreadsheet to make up the "average residential load profile."

The hourly average is called the "average demand". It is a measure of how fast or how slowly the customer, or summarily, the class or system, uses-delivers electricity. It is critical for the electric utility company to know the average demand for every hour of the year for the respective customer classes because it allows them to plan or estimate how much electricity they need to make available to their customers during any particular period of the year. **(The most critical aspect of this calculation which needs to be pointed out is that the calculation of the demand is a function of how much electricity is used by or sold to customers. Since the electricity (sales) sold or supplied to all customer classes is inflated by the defendant company, the rate at which the class uses the energy (demands), is automatically inflated as well. By inflating the amount of energy used hour by hour by customers in the sample and adjusting the aggregate sales levels of the sampled customer classes so that the sample and sales figures corresponded, or vice versa, Consumers Energy not only overstated the average demands, they overstated how much electricity they generated for these customer classes. The end result is extraordinary cost increases to all residential customers, small commercial and industrial customers, and large commercial and industrial customers. The impact of such cost increases**

16

affects not only the customer base but the economic stability of the **affected regions.)**

If the average use for the residential customer for the hour in question is changed, for instance from 0.75 kWhs to 1.0 kWh, the impact to the residential class for just hour is quite substantial. If the estimate for the amount used by the class is inflated from 1.2 Million kWhs to 1.6 Million kWhs based upon the falsified demand for that hour, the increase in cost to the residential class is astronomical. At average electricity rate of 10 ¢ per kilowatt-hour, the cost impact to the residential class is $40,000.00 for one hour out of 8,760 hours in a year. Across the year, an inflation in the demand of 0.25 to 1 kWhs per hour for all 8,760 hours results in an fraudulent increase in cost to the residential class that would be approximately $350 Million. That figure is fairly accurate given the largely overstated $1.7 Billion in Purchased Power and Fuel Costs that Defendant Consumers Energy collected for the year 2010.

**Defendant Consumers Energy fraudulently inflated the amount of energy used during each hour by the customer classes in question by extraordinary amounts. By manipulating the amount of electricity sold-supplied to various customer classes upwards, Consumers Energy fraudulently increased the costs attributed to that class and the amount of revenue that they collected from it by exceptional levels. By inflating the amount of sales and-or deliveries of electricity to customer classes, and correspondingly the amount of electricity supplied to them, by direct**

17

extension, the demands of the respective customer classes and of the Defendant's electrical system were inflated.  The accuracy of the amount of electricity sold-supplied-delivered, the demands, and when it is sold and-or delivered is most critical as it determines how much customers were charged in their respective electricity rates and other related charges.  On the other hand, the fraudulently increased amounts of electricity sold and supplied-delivered also determined the fraudulently recovered revenues that defendant Consumers Energy collected in the past and continues to collect as well.)

42.   By inflating the demands and billed sales of electricity—and by extension other statistics calculated using these figures—to the Residential, Secondary, and Primary customers from 2008 to 2012, Consumers Energy falsified the costs that it incurred to serve these three classes of customers and thereby fraudulently, increased the revenues that it collected from these rate payers through fabricated revenue requirements.

(Revenue Requirements is equal to Revenues minus Expenses and Taxes. Fraudulently overstating "prudent" expenses based upon falsified data, beyond current revenue levels, leads to a "revenue requirement".   In other words, Consumers Energy made a case to government regulators that essentially indicated that they have spent money for necessary expenses prudently, as required by law, and they still are not recovering all of their just and reasonable costs in the current electricity rates.  The Defendants then falsely argued in their

18

rate proceedings, using fraudulent regulatory filings, testimony, exhibits, and audit and discovery responses, that they needed more money to be able to provide electricity to customers at a satisfactory service level and make a reasonable return. For example, an appropriate increase in costs could be an unforeseen increase in the price of fuel or unforeseen increase in the price of the wires used to deliver electricity. Where cost is determined by the amount of electricity and-or the demands, such as fuel and wire sizes, overstating these two, sales-deliveries and-or demands, automatically leads to fraudulent cost increases.).

43.     Defendant Consumers Energy falsified cost allocation schedules for 2008 to 2012 rate cases (and prior) that were developed using fraudulent electricity sales and demands for residential, secondary and primary customers.

(Cost allocation schedules are created using customer class sales and the respective customer class load research samples in order to figure out the portion or percentage of the electrical system costs that each customer class caused. By falsifying how much and when each customer class used electricity, Defendant Consumers Energy chose which customer class would pay for various portions of the falsified costs to run its electrical system.)

44.     By using fraudulently inflated electric energy sales levels for the residential, secondary, and primary customer classes for 2008 to 2012 (and prior), Defendant Consumers Energy falsified the amount of fuel used to produce electricity for the respective customer classes.

19

(Fuel cost is considered to be directly tied to the number of units of electricity produced. Power plants, power lines, transformers, and other electrical system equipment are built-sized to meet peak demand, coincident and non-coincident, so it's cost is based upon the maximum rate at which electricity is used by the respective classes at the time of the monthly maximum system output (i.e., system peak) and the class peak which occurs at a time during the month when the system peak does NOT happen (non-coincident); however, fuel is burned exclusively to produce energy and its' cost varies with the amount of energy produced. So its' cost is determined point for point, unit by unit, by the number of kilowatt-hours of electricity sold-supplied to each customer class. Theoretically, in terms of production, an increase in the production of 1 "unit" of electricity necessitates an increase of 1 "unit" of fuel in order to produce that unit of electricity. As the Defendants fraudulently increased the amount of electricity supplied-sold to its respective customer classes, it also concomitantly fraudulently increased fuel costs – meaning, Consumers Energy claimed to the MPSC that they increased fuel costs when in reality they did not use that fuel, because they did not produce the amount of electricity that they claimed to produce.)

45.   By using fraudulently inflated energy levels, Defendant Consumers Energy, as a percentage of total energy at generation, falsely overstated its system losses.

(As electricity flows through an electrical system, its levels change because of the variation in system components. Since the company has to produce more

20

energy up front in order to compensate for these losses and to ensure that power is at the desired level as it reaches the customer, by overstating sales of electricity to the respective customer classes, defendant Consumers Energy collected an additional premium of slightly less than 10 percent—equal to the loss percentage—for the portion of sales that are overstated.)

**How the Fraud was carried out**

46.   Co-conspirator RLW Analytics—the original firm name—developed its proprietary RLW™ LRS—Load Research System software (or "KEMA's Software System for Load Research and Program Evaluation") with the support of Consumers Energy in 1974.  Consumers Energy uses this software, which includes, Model Based Statistical Software (MBSS), to perform various load research analyses among other functions.   Along with these software programs, co-conspirator, RLW Analytics   created   custom   software   programs   which   allowed   defendant Consumers Energy to conduct its fraud.

(This RLW™ LRS software was specifically designed to produce cost of service studies and load research results such as load profiles for all of the various customer groups and develop cost allocation schedules-analyses for electric utilities.    The fact that Consumers Energy failed to mention which software package in its current rate case before the MPSC U-17087 shows that the Defendants wanted to conceal the relationship between these two entities to cover up the conspiracy and the fraud. In the Microsoft Powerpoint file entitled, "Cost of Service, The Big Book of COS",  The section entitled, "Kema Load

Research System, RLW LRS Process and Notes", the "rlw.sas" is delineated as the program used to process data for the defendant company's load research study.  The "rlw.sas" program delineates exactly which fraudulently developed data files, including but not limited to the billing, sample and system data files, were used as input to the program to produce the falsified load research analyses.)

47.   Along with Co-conspirators RLW Analytics, Defendant Consumers Energy used custom software created by RLW Analytics to exchange (switch), recycle, manipulate/alter/transmute account identification data such as the Process ID, Installation number, Legacy Account Number, meter numbers, from the defendant's Consumers Energy various billing systems (i.e., CBS (Customer Billing System), CA Main, and Special Ledger and other system(s)) and repositories-databases.  Defendants did this in order to create phony accounts and to hide, transfer and record fraudulently increased demands and add fraudulent sales of electricity to Residential, Secondary, and Primary customer class sales levels which they reported to the MPSC in their regulatory filings. Defendants also used phony accounts created with this software in the respective rate class samples and census to inflate sales and demands, and average sales and demands per customer figures which they then used in the derivation of cost allocation schedules and electricity rates and other related charges.

48.   Defendant Consumers Energy used production interval data, non-jurisdictional –

accounts regulated by (FERC) Federal Energy Regulatory Commission and other

extraordinarily high use electric customer data (Wholesale for Resale, Purchase

and Interchange Power, Cogeneration, etc.) in place of the original account

interval data to accomplish their fraud against residential, secondary and primary

customers.

(Production interval data, wholesale for resale interval-account data (e.g.,

wholesale customers, like small towns, purchase power in "blocks" and resell the

electricity to their residential and-or other municipal customers), Purchase and

Interchange Power account-interval data, Cogeneration account-interval data,

and other extraordinarily high use electric customer account-interval data is

anywhere from 500 to 9,000 times more than the average residential customer's

interval data.  For one phony account in the residential sample, the amount of

energy used in an hour can power more than 500 homes.

The inflation levels can be slightly less than this for secondary and primary

customers; nonetheless, by comparison, they are no less extraordinary for these

classes of customers.  Given the fact that Consumers Energy used fraudulent

interval and account data to inflate sales, maximum demands, and the load

profiles of the respective customer classes, the impact of the continuing fraud is

enormous as the statistics that are calculated from the falsified underlying data is

used in the derivation of cost allocation schedules, electricity rates, and other

related electric charges. This was done by Defendants in order to ascribe

23

fraudulent costs to these customers and allocate the costs deliberately and not based upon actual data. In the end, Defendants collected exorbitantly high revenues through their electricity rates and other related charges based upon fraud.)

49.    In using custom software to create phony accounts in the billing files to ensure that that sales levels of the respective classes corresponded with the results from the samples or vice versa, Defendant Consumers Energy conspired with RLW Analytics—KEMA Consultants—DNV KEMA Company to commit fraud upon Consumers Energy rate payers, the state of Michigan, and the federal government of the United States of America by reporting sales of electricity to fake customers.

(The billing file is simply a file that contains information that includes but is not limited to, the total annual electricity used by each customer—calculated from monthly data—the maximum demand, on and off peak electricity amounts, and billed demand.  The phony accounts were added to this file in order to expand the total amount of energy used by all consumers Energy customers in the respective customer classes.  Then, in the reports to the MPSC, the number of accounts actually used to reach this total was changed to hide the fraudulent use of phony accounts in the billing file.)

50.    Defendant Consumers Energy not only used the RLW™ LRS software and custom SAS (Statistical Analysis Software) software programs RLW Analytics created to conduct the fraud, the system of fraud was taught to defendants

Hubert Miller and Eric Keaton, among other Consumers Energy employees, and implemented by RLW Analytics-KEMA-DNV Consultants co-owners Roger L. Wright, Ph.D., and Mr. Curt Puckett, and principal, Mr. Tim Hennessy.

51.     Co-Conspirator RLW Analytics-KEMA Consultants-DNV KEMA has been remunerated for work with Consumers Energy exceeding $100,000.00.

52.     Co-Conspirator RLW Analytics-KEMA Consultants-DNV KEMA was paid for services to Consumers Energy in various departments including but not limited to load research, demand side management, energy delivery, meter technology, and smart grid.

(With the breadth of its history, work performed for and operation within Consumers Energy, RLW Analytics staff assisted in the coordination of the activity of the criminal enterprise.  Given their association among so many departments within Defendant Consumers Energy, RLW Analytics personnel was integral to producing consistent falsified reports to the MPSC in order justify increases in electricity rates and other related charges based upon fraud.)

53.     The scope of work that Defendant Consumers Energy contracted with RLW Analytics and-or KEMA Incorporated includes but is not limited to:

    a.     the design, implementation and review of tariffs or rate description sheets
    b.     data storage for load research department
    c.     data analysis for load research department
    d.     data transfer for load research department
    e.     data Validation and Editing for load research department

f.      reporting for load research department

g.      Training for load research department,

h.      Project Management for load research department

i.      Testing the integration of Defendant Consumers Energy Computer Information Systems

j.      Other functions in various departments of Defendant Consumers Energy

54.     According to his own resume, Co-Conspirator Mr. Curt D. Puckett, former President of RLW Analytics and principal of KEMA Incorporated, is a former load research supervisor for Consumers Energy (formerly Consumers Power Company).

55.     According to his own resume, Co-conspirator Mr. Curt D. Puckett was employed in this role from 1979 to 1990.

56.     According to his own resume, Co-conspirator Mr. Curt D. Puckett began his employment with RLW Analytics in 1987 while still employed at Consumers Energy.

57.     According to his own resume, while at Consumers Energy, Co-conspirator Mr. Curt D. Puckett was "responsible for the design, implementation, administration and analyses of all of Consumers Power Company's load research activities."

58.     According to his own resume, Co-conspirator Mr. Curt D. Puckett was "actively involved in the development of the Company's demand-side management and integrated resource planning strategies."

59.    According to his own resume, Co-conspirator Mr. Curt D. Puckett "presented expert testimony" for Defendant Consumers Energy "on these issues in MPSC Case numbers U-9172 and U-8871."

60.    According to emails between the two companies and from various departments within Consumers Energy (load research, energy supply, legal, accounting, rates and regulation, business technical services, metering-mv90 and others), Co-conspirators Consumers Energy and RLW Analytics-KEMA Consultants, coordinated and made extensive plans for more than 6 months in 2007 to mislead the MPSC, and commit fraud against its' customers, the federal government of the United States of America, and the state Michigan (prior email records indicates that the fraud existed before then as well).

61.    Defendant Consumers Energy and Co-conspirator Mr. Curt D. Puckett conducted some of its planning through the use of email communications and meetings (notes from the meetings are maintained) held at Company headquarters in Jackson, Michigan, which reveal the conspiracy to commit fraud upon its rate payers, the state of Michigan and the United States government.

62.    The custom software and cross reference files that Defendant Consumers Energy and Co-conspirator Mr. Curt D. Puckett created were used to format various account data, and create phony accounts in Consumers Energy billing files (named "sapbilling2010", "sapbilling2009", and so on) in order to fraudulently inflate its electric sales report to the MPSC.   With respect to the sample, additional phony accounts are used in the Residential and large and Small

27

commercial and industrial business customer class samples and compiled for the 2010 cost of service study period or 2011 Electric rate case into a file named "cms_samplesites". The cms_samplesites file was used by Defendants as an input file into the RLW™ LRS software (rlw.sas) in order to inflate the parameters including but not limited to the average demand, class demand at system peak, Non-coincident peak demand, on and off peak energy and average use per customer. These parameters were then used to develop the cost allocation schedules and derive electricity rates and other related charges.

The use of these billing files, which contained phony accounts, as input to the RLW LRS "rlw.sas" file, which produces key parameters used in the cost of service study, rate design, and other cost recovery mechanisms and charges shows that the phony accounts were used as underlying data for the various analyses upon which cost allocation schedules and with which electricity rates and other related charges were derived. The "rlw.sas" file was different from the file given to Plaintiff Anderson by defendant Eric J. Keaton to use to conduct load research and cost allocation analyses. The "LRS.sas" file that was given to Plaintiff Anderson to use and presented in his limited training sessions, "Intro to ECOSS Modeling", partially concealed what had been done by Defendants.

One way that Defendant Consumers Energy obscured the identity of the sample-site was by using the letter "C" together with the original and-or phony Process ID. This simple tactic precludes searching for the Process ID identifier in the file.

Hence, unless there is access to the original program code used to produce the phony accounts, it is almost impossible to identify the fake accounts.

Another way that Defendant Consumers Energy obscured the identity of wholesale account load data in the respective samples was to shorten the original wholesale and-or interchange account number (PID) in order to match the original length of jurisdictional process_ids so they would not stick out like a sore thumb. Then, the defendants recoded the wholesale account number into a process_id. Consumers Energy at times also reused this new number as a legacy account number and as a sample site identification number.)

63.   The names of the custom SAS software programs and fraudulent interval load data-billing files that were used to falsify the Defendant company's respective load profiles and sales figures which were then used to derive cost allocation schedules, electricity rates and other related charges, include but are not limited to:

> (a) Step-0100 check Program for Source Data.sas
>
> (b) Step-0200 Set up of Source data sets.sas
>
> (c) Step-0300 Summary.sas
>
> (d) Step-0400 VIT Check.sas
>
> (e) Step-0410 Individual Customer Check.sas

(f)  Step-0500 Spike zero Edits.sas

(g) Step-0501 Spike zero Edits.sas

(h) Step-0600 Billing Data Setup.sas

(i)  Step-0700 Billing Data-Interal Data Check.sas

(j)  Step-0800 Edited and Interval Data Check.sas

read in mv90 Interval loads.sas—used to read in load data and to create and hide load data from phony accounts in the respective samples

read in mv90 interval loads-EK.sas— used to read in load data and to create and hide load data from phony accounts in the respective samples

read in mv90 interval loads2.sas— used to read in load data and to create and hide load data from phony accounts in the respective samples.  Also read in rate codes, which at times were mapped to rate sectors, from sample meters, including from residential space heating customers which defendants claimed to the MPSC had been lost.  The original data-billing files contained all of the information needed to determine the type of customer, including the rate code, for whom the data had been collected, including:

PROCESSID in position 1-10

MTRNUM in position 18-35

CONTRACT ACCT in position 37-48

INSTALLATION FACT in position 50-59

LEGACY ACCT Number in position 61-73

RCCD—Rate code in position 75-85

SV Service Voltage Level in position 86-87

MP Meter Point Code in position 89-90

MTRADJUSTMENT METER ADJUSTMENT in positions 92-107

CONSBEGDT—Beginning Consumption Date @124

CONSENDDT—Ending Consumption Date @136

step 0200-Set up of MV90 RCON.sas— used to read in load data and to create and hide load data from phony accounts in the respective samples

Step-0200 set up of mv90 source data sets to eric.sas— used to read in load data and to create and hide load data from phony accounts in the respective samples

Step-0300 combine CBS and mv90 source data sets to eric.sas— used to read in load billing data and to create and hide load data from phony accounts in the respective samples

Reading in SAP billing data—used to compile original accounts and to create and hide phony accounts in the respective aggregate annual billing files

31

mv90xref.txt—used to hide phony interval/demand/annual/monthly use data in the respective class samples/billing files

cosxref.txt—used to hide phony interval/demand/annual/monthly use data in the respective class samples/billing files

cmsxref.txt—used to hide phony interval/demand/annual/monthly use data in the respective class samples/billing files

cbsxref.txt—used to hide phony interval/demand/annual/monthly use data in the respective class samples/billing files

sapbilling2009—contains original and falsified accounts for 2009

sapbilling2010—contains original and falsified accounts for 2010

lrdata2008—contains falsified interval data used in 2008 load study

lrdata2009—contains falsified interval data used in 2009 load study

64.     Each phony account is composed of two or more individual accounts that are recycled from current and-or expired accounts in defendant Consumers Energy's billing systems and repositories-databases (i.e., SAP, CBS/CA Main, Special Ledger, Legacy Accounts, production interval data files, non-jurisdictional Wholesale for Resale, Purchase and Interchange Power, Cogeneration,  and other extraordinarily high electricity use and interchange customer accounts) and contains some or all of the original account field identifications and account classifications from each underlying account that make up the "new" account.

For some of the phony accounts, the defendants included a "remarks" section in the cross reference files and the "2009 sample meters" excel file which specifies the account identification numbers, i.e., meter number and rates, that the phony account was "assigned". The original load interval and billing data files' information-fields is also specified in the "RLW/Cost Study Data Requirements" file created by Eric Keaton and used by RLW Analytics in the development of the fraudulent accounts and load data.

(Five identification parameters that are consistently used by Defendants to connect the real and phony accounts are, the Process ID, meter number, Legacy Account number, the installation fact and the PID. Defendant Consumers Energy used these identifiers more than once to transfer and hide the true source of the fraudulently switched underlying data.)

65.   An Excel Workbook entitled, 2009 sample Meters, created by Defendant Eric Keaton, senior Rate Analyst for Consumers Energy, shows the original rate-sector codes and various account identification parameters of the two accounts used to create the phony accounts and the "new" recoded rate-sector code assigned to the phony account used in the respective class samples.

(Rate-*sector* codes are the numeric and-or alpha-numeric titles given to groups or sectors of customers within a customer class who have largely the same characteristics. An example of this is residential customers who use electric space heaters to heat their homes. For Consumers Energy residential customers, their sector would be A-1SH, their (legacy) rate code would include

rate code 230 and others from the legacy system. Defendant Consumers Energy maintained the original rate and rate codes for such residential customers (and all other customers) mapped into the sectors and along with the respective sector code, in the "SummaryofStats," "sectors," and "sectors use" excel files. They also pulled the information from Microsoft access database files into the excel Cost of Service model "UCOS—XXXX" used to develop and report allocation factors for previous years' rate cases but eliminated the information in the model provided to plaintiff Anderson. The aforementioned spreadsheet which specifies the original rate codes, referred to as "SAP_RCCD" and "RCCD" contain the original rates, rate codes and the sectors into which they are mapped, and the corresponding load statistics for more than 40 rates. The load data for space heating customers were pulled from raw data files and formatted using the "read in interval loads mv902.sas file—but they exchanged the sample space heating customer's interval data with interval data from interchange accounts (not a residential customer) and accounts which record extremely high levels of energy for a wholesale customer and-or interchange account (Rate:  PPI, Rate Code PPI7 and-or Rate: WR, Rate Code: WFR) in order to **drastically and fraudulently inflate** the parameters used in the derivation of cost allocation schedules and billing determinants for electricity rates and other related costs, including but not limited to the aggregate sales and demand figures, average demand, class and average demand at system peak, Non-coincident peak demand, on and off peak energy and average use per customer for the

34

residential, secondary and primary customer classes and their respective sectors.)

66.  The Excel file entitled "Original ROA file with meters" contains the original meter numbers—and the associated account information including the name, address and Process ID—that are recycled over and over again in order for Defendants to hide fraudulently added accounts that are used in the respective rate class and-or sectors' samples to inflate the parameters used to develop cost allocation schedules and derive billing determinants for electricity rates and other related charges, including but not limited to average demand, coincident peak demand, average demand at time of system peak, Non-coincident peak demand, sales, coincidence factors, and load factors for the various customer classes which contain ROA customers.

(Retail Open Access (ROA) customers buy their power from another supplier and use Consumers Energy's delivery system to receive their power.  These customers are responsible for the delivery costs which are, in part, based upon their demands.  By overstating their demands and other parameters and-or billing determinants, Defendant Consumers Energy fraudulently collected and continues to fraudulent collect additional revenues by attributing more costs than they actually cause or impose on Defendant's electrical system.)

67.  As with the residential customer class, the original rate-sector codes of production interval data accounts, non-jurisdictional and other extraordinarily high use electric customers were deliberately changed to reflect the rate-sector code

of drastically lower energy use customers in the large and small commercial and industrial business customer classes in order to hide the original rate code and account identification information fraudulently used in the respective samples and aggregate electric sales totals.  (Defendants here purposely removed the lower energy using customer data from their sample, unbeknownst to the MPSC and replaced those customers with much higher energy using customer data, also unbeknownst to the MPSC, to falsely inflate their aggregate sales and aggregate demands, and the average demands and the average use of electricity per customer.)

68.   The summary of the statistics for all of the individual customer accounts included in each (sector) of the various customer classes of Consumers Energy—between 53 and 55 sectors—shows that the underlying billing files used in the load study and the total sales figures reported to the MPSC for each customer class include the extraordinary amounts of electricity fraudulently recorded in phony accounts. For each rate sector, the summary specifies which module or SAS program from the RLW™ LRS software was used to compute the statistics, the class to which the sector belongs, class code, sector, sector code, number of accounts, average use per account, minimum, maximum, standard deviation, coefficient of variance, and total annual energy (kWh) for each sector and each class—which corresponds to the figures reported to the MPSC—and are recorded in Microsoft Excel "parameter files" of the load research folders in an excel workbook entitled "RLW"; specifically, the statistics are in the spreadsheet entitled "popdata," which

stands for population data.   (The "RLW" excel workbook contains other summaries of data and analyses in separate spreadsheets which delineate key statistics used to develop the defendants cost allocation schedules and derive billing determinants used in the design of electricity rates and other related charges.   Billing determinants are things like consistency and efficiency of electricity use, i.e., load factor and coincidence factor, and other calculated parameters which go into the determination of rates for the respective sectors among customer classes.)

69.   This summary shows that the maximum levels used in the development of monthly and annual sales figures reported to the MPSC by Defendants for the Residential customer class exceed the maximum allowable levels established by MPSC approved tariffs and the physical constraints of various components of the Defendant's secondary distribution system, i.e., transformers for residential sites. (Tariffs explain and define the guidelines, i.e., minimum and maximum rates for electricity, charges for accessing distribution system, etcetera, for customers identified as part of the various rate classes.)

70.   This summary also shows that the maximum levels used in the development of monthly and annual sales figures reported to the MPSC for the Secondary and Primary customer classes also drastically differ from amounts that the Defendant reported in raw data files supplied to the MPSC in September 2011.

71.   Load research input billing files (sapbilling2009. sas7bdat, sapbilling2010. sas7bdat, and so on) show that the number of individual customer accounts and

the respective billed energy used to establish fraudulent annual kWh sales figures for the Residential, large and Small commercial and industrial business customer classes exceed the number of accounts reported to the MPSC in the defendant company's regulatory filings and in data files supplied to the MPSC in response to MPSC discovery requests from September 2011 and in responses to interrogatories in Jackson County District Court Case 12-2235-CD. The number of phony accounts range anywhere from 10,000 fraudulent accounts to more than 400,000 additional phony accounts per year.

72.   As an example, using normal customer accounts interspersed among phony accounts, Consumers Energy individual residential customer account kWh levels ranged from 0 to approximately 25,000,000 million kWhs for the residential class and from 0 to more than 36,000,000 kWhs for the small commercial and industrial business class. Other nonsensical ranges of annual electricity use were included for the large commercial and industrial business class as well. Utilizing the RLW™ LRS software, Consumers Energy used these fraudulently inflated annual sales figures for the respective customer classes' kWh levels in their report to the MPSC and to develop the respective load profiles and cost allocation schedules from other equally outlandish customer class sample data.

(The inflated sales in the Defendant's billing files correspond with the inflated demands in their load profiles of the respective samples and census. Using the ratio estimation statistical technique as prescribed by Consumers Energy company documents and KEMA RLW™ LRS software documentation, by

multiplying the average demand for each hour in the load profile of the respective customer class by the appropriate ratio of the total sum of electricity used by all members of customer class during the specified hour to the collective amount energy used by customers in the respective sample during the same hour, the result, summed across all 8,760 hours will be equal to the annual sales figure for the customer class.  In other words, the annual sales figure and the load profiles for each class are inextricably tied together.)

73.     The summary of the falsified accounts as stated in the above paragraph shows that the final annual sales figures that Defendants reported to the MPSC for the respective rate classes were digit for digit exact matches for its 2010 reports.  In other words, the total reached using legitimate and phony accounts is the total reported to the MPSC.  (There is no way possible that the respective rate classes annual sales figures could have matched digit for digit if the individual sales were recorded properly, which is further proof that the sales figures were fraudulent.  As an example, the secondary customer class account that used the most energy in 2008 and 2009 had 36.5 million kilowatt hours for both years, exactly, which is the same amount that came up year after year, and the odds of that number being exactly the same year after year are likened to the odds of winning the Powerball lottery).

74.     It can be determined that defendant Consumers Energy recycled the phony accounts used to develop the respective sales figures for the residential, secondary and primary customer classes as the summary statistics for the 53 out

of 55 sectors in billing files for 2009, 2010, and so on are <u>exactly the same from year to year</u>.   For the other two sectors, Consumers Energy fraudulently manufactured these sectors' sales in various years.  As an example, where the summary statistics for year 2009 show an annual kWh for the residential class was 16,166,520,341 kWhs, the average use per account was 8, 143 kWhs with the number of residential customer accounts for the being 1,985,244.  Similarly for year 2010, the average use per residential account was the same, 8,143 kWhs; the number of accounts was less, 1,567,627; and the 2010 residential kWh level was 12,992,608,287 kWhs.   Additionally, the other population parameters such as the individual residential account minimum annual use, individual residential account maximum annual use, standard deviation, coefficient of variation were all the same for both 2009 and 2010 residential class billing data.

75.    According to its own summary reports produced from the RLW™ LRS rlw.sas software program, Consumers Energy's sample analyses for the Residential, Primary and Secondary classes failed to comply with acceptable Load Research Standard Industry practices.  (Meaning, the sample produced by Defendants did not conform to the guidelines for statistical testing.)

76.    Defendant Consumers Energy failed to restrict the sample participants in the respective rate and customer classes to accounts originally coded as such. (No statistical analysis of a sample is valid if it fails this test.  **By including non-residential accounts in the residential sample**, non-large business customer

class accounts in the large commercial and industrial business class sample and non-small business accounts in the small commercial and industrial business class sample, the company, in effect, made this "sample" a tool with which they produced their fraud. (For example, in reference to the residential class, the tariff allows a maximum connected load of 10kW. This is a daily maximum of 240 kWhs—which is still completely extremely unlikely and improbable. The Defendant company used fraudulently recoded accounts in the residential sample that had daily maximums of 11,000 kWhs up to 389,000 kWhs. Federal Law, PURPA Act of 1978 requires that they use statistically valid samples, which this clearly was not.)

77.    Instead of using a random sampling method, Defendant Consumers Energy fabricated or hand-picked customer accounts which they included in the respective samples and manufactured their respective load profiles. (Generally, Random sampling is conducted by choosing participants at random without bias. The Defendants deliberately chose participants for their respective customer class samples and created artificial consumption patterns using falsified interval data.)

78.    Based upon Defendant Consumers Energy's own summary results, Sample parameters and statistics for the Residential, Primary, and Secondary customer classes and underlying sectors—including the coefficient of variance, standard deviation, standard error, and relative precision—failed to fall within statistically acceptable ranges. (Given the average demand and average use per customer

41

figures, it is impossible for Defendant Consumers Energy to have arrived at those figures using original residential account data alone. The out of range figures for the statistical measurements reveal that <u>the "sample" was manipulated</u>.)

79.   Additional statistical tests, such as the F-test or hypothesis testing, reveal that the upper bounds of the Defendants residential and large and small business sample accounts are impossibly astronomical (outliers) and that the population parameters calculated with the underlying data are invalid statistics.

**Falsified Testimony to the MPSC**

80.   In response to a September 2011 MPSC discovery request, Consumers Energy failed to comply with MPSC demands to supply <u>all</u> of the formatted underlying data used in the calculation of its allocation factors. The defendants also failed to explain in *great detail* or for that matter, in any meaningful detail, how the company developed its allocation factors in MPSC case U-17087.

81.   By failing to comply with the MPSC discovery request, Consumers Energy failed to comply with the applicable portions of the Federal (and corresponding state) law—Public Regulatory Policies Act of 1978, 16 U.S.C. section 2643—which constrains them to supply the information requested in the discovery request Section 290.102, entitled, "Information gathering and filing" which states:

All nonexempt utilities must file the data required by section 133 (a) of the Public Regulatory Policies Act of 1978, 16 U.S.C. section 2643, with their state

regulatory authorities. . . All nonexempt electric utilities shall file an affidavit with the Commission certifying that the requisite state filing was made.

*Section 133*, entitled, *Gathering Information on Costs of Service* and *part (a)* entitled, *Information Required* to be gathered, states

Each electric utility shall periodically gather information under such rules (promulgated by the commission) as the commission determines necessary to allow determination of the costs associated with providing electric service. For purposes of this section, and for purposes of any consideration and determination respecting the standard established by section 111 (d) (2) [16 USC 2621], such costs shall be separated, to the maximum extent practicable, into the following components: customer cost component, demand cost component, and energy cost component. Rules under this subsection shall include requirements for the gathering of the following information with respect to each utility—

*Section 133 part (a) subsection (1)*

The costs of serving each electric consumer class, including costs of serving different consumption patterns within such class, based on voltage level, time of use, and other appropriate factors;

*Section 133 part (a) subsection (2)*

43

Daily kilowatt demand load curves [i.e., load profile, a term used to **describe how much electricity this group of customers used for each hour in a day] for all electric consumer classes** combined representative of daily and seasonal differences in demand, and daily kilowatt demand load curves for each electric consumer class for which there is a separate rate, representative of daily and seasonal differences in demand.

*Section 133 part (a) subsections*

(3) Annual capital, operating, and maintenance costs—

(A) For transmission and distribution services, and

(B)     For each type of generating unit;

and

(4)     costs of purchased power, including representative daily and seasonal differences in the amount of such costs.

Such rules shall provide that information required to be gathered under this section shall be presented in such categories and such detail as may be necessary to carry out the purposes of this section.

*Section 133 part (c)* entitled, "*Filing and Publication*",

Not later than two years after the date of enactment of this Act, and periodically, but not less frequently than every two years thereafter, each electric utility shall file with—

(1)    The commission and

(2)    Any State regulatory authority which has ratemaking authority for such utility, the information gathered pursuant to this section and **make such information available to the public in such form and manner as the Commission shall prescribe**. . .

82.    Consumers Energy failed to comply with applicable state regulations of the Michigan Public Service Commision (By authority conferred on the public service commission by section 5 of Act No. 419 of the Public Acts of 1919, as amended, and section 4 of Act No. 3 of the Public Acts of 1939, as amended, being §460.55 and 460.4 of the Michigan Compiled Laws), specifically Rule 460.2531 "Automatic data processing record; retention periods" which required that Consumers Energy provide all of the underlying data used in the Consumers Energy electric load study and in the derivation of cost allocation schedules to be supplied to the Michigan Public Service Commission.

83.    Given the fact that the Defendant company still has not produced all of the data nor any detailed exhibits explaining its actual methods used in the electric load study, Defendant Consumers Energy is still evading, misleading, and lying to the

45

MPSC about the statistical methods and underlying data used to develop its cost allocation schedules.

84.   Contrary to testimony given to the MPSC in rate case U-17087, Consumers Energy maintains excel workbooks/spreadsheets which summarize the fraudulent data used to derive key statistics used in the development of their allocation schedules, including, but not limited to, coincident peaks statistics (4 CP, 12 CP, etc.)—the rate of energy consumption used by the respective rate classes during applicable monthly system peak demand, time of day energy (On-peak and critical peak energy), seasonal energy, class and individual customer maximum demands, non-coincident peak demand, average seasonal day-type profiles, and the respective load factors used for 2011 rate case U-16794 and prior.  The excel spreadsheets which contain this information include but are not limited to: (**Defendants claimed that they lost the rate-sector codes.  The below information shows that they did not lose the sectors - rate codes, and they do have key parameters and statistics by sector (which are mapped to the associated legacy rate codes) and used to develop cost allocation schedules**).

    (a)   Population(Pop) and Sample(Sam) site Information (M_ refers to the RLW™ MBSS Module Report)

        1.   M1_PopData_Deleted

        2.   M1_PopData_Filters

        3.   M1_PopData_Stats

        4.   M2_SamData_Deleted_filled

5.   M2_SamData_Filters_filled

6.   M2_SamData_MonthlyStats

7.   M2_SamData_Sites_filled

8.   M2_SamData_Stats_filled

(b)   Statistical Reports Generated From RLW™ MBSS Software

1.   M3_System_Annualpeaks_atCust

2.   M3_System_Annualpeaks_filled

3.   M3_System_Monthlypeaks_atCust

4.   M3_System_Monthlypeaks_filled

5.   M6_PostStrat_MB_filled

6.   M7_HourlyAnal_CW_Trueup_atCust

7.   M9_KeyDays_All_E1_All_REC

8.   M9_KeyDays_All_E1_Rate-E1_REC

9.   M9_KeyDays_All_GML_All_REC

10.   M9_KeyDays_All_GML_Rate-L1_REC

11.   M9_KeyDays_All_GP_All_REC

12.   M9_KeyDays_All_GP_GPGEI_REC

13.   M9_KeyDays_All_GP_GPGMP_REC

14.   M9_KeyDays_All_GP_Rate-GP_REC

15.   M9_KeyDays_All_GPD_All_REC

16.   M9_KeyDays_All_GPD_GPD1GEI_REC

17.   M9_KeyDays_All_GPD_GPD1GFM_REC

18.   M9_KeyDays_All_GPD_GPD1GI_REC

19.   M9_KeyDays_All_GPD_GPD1GMP_REC

20.   M9_KeyDays_All_GPD_GPD2GEI_REC

21.   M9_KeyDays_All_GPD_GPD2GFM_REC

47

22.  M9_KeyDays_All_GPD_GPD2GI_REC

23.  M9_KeyDays_All_GPD_GPD2GMP_REC

24.  M9_KeyDays_All_GPD_GPD3GEI_REC

25.  M9_KeyDays_All_GPD_GPD3GFM_REC

26.  M9_KeyDays_All_GPD_GPD3GMP_REC

27.  M9_KeyDays_All_GPD_Rate-GPDP_REC

28.  M9_KeyDays_All_GPD_Rate-GPDS_REC

29.  M9_KeyDays_All_GPD_Rate-GPDT_REC

30.  M9_KeyDays_All_GPDROA_All_REC

31.  M9_KeyDays_All_GPDROA_GPDROA1GEI_REC

32.  M9_KeyDays_All_GPDROA_GPDROA2GEI_REC

33.  M9_KeyDays_All_GPDROA_GPDROA3GEI_REC

34.  M9_KeyDays_All_GPDROA_GPDROA3GFM_REC

35.  M9_KeyDays_All_GPDROA_Rate-GPDROAP_REC

36.  M9_KeyDays_All_GPDROA_Rate-GPDROAS_REC

37.  M9_KeyDays_All_GPDROA_Rate-GPDROAT_REC

38.  M9_KeyDays_All_GPROA_All_REC

39.  M9_KeyDays_All_GPROA_GPROAGEI_REC

40.  M9_KeyDays_All_GPROA_Rate-GPROA_REC

41.  M9_KeyDays_All_GS_All_REC

42.  M9_KeyDays_All_GS_GSGEI_REC

43.  M9_KeyDays_All_GS_GSGMP_REC

44.  M9_KeyDays_All_GS_Rate-GS_REC

45.  M9_KeyDays_All_GSD_All_REC

46.  M9_KeyDays_All_GSD_GSDGEI_REC

47.  M9_KeyDays_All_GSD_Rate-GSD_REC

48.   M9_KeyDays_All_GSDROA_All_REC

49.   M9_KeyDays_All_GSDROA_GSDROAGEI_REC

50.   M9_KeyDays_All_GSDROA_Rate-GSDROA_REC

51.   M9_KeyDays_All_GSG_All_REC

52.   M9_KeyDays_All_GSG_Rate-CGP_REC

53.   M9_KeyDays_All_GSG_Rate-CGS_REC

54.   M9_KeyDays_All_GSG_Rate-CGT_REC

55.   M9_KeyDays_All_GSROA_All_REC

56.   M9_KeyDays_All_GSROA_GSROAGEI_REC

57.   M9_KeyDays_All_GSROA_Rate-GSROA_REC

58.   M9_KeyDays_All_GU_All_REC

59.   M9_KeyDays_All_GU_Rate-UNM_REC

60.   M9_KeyDays_All_GUL_All_REC

61.   M9_KeyDays_All_GUL_Rate-GUL_REC

62.   M9_KeyDays_All_NON_All_REC

63.   M9_KeyDays_All_NON_Rate-150_REC

64.   M9_KeyDays_All_NON_Rate-ALP_REC

65.   M9_KeyDays_All_RS_All_REC

66.   M9_KeyDays_All_RS_Rate-A1A_REC

**67.   M9_KeyDays_All_RS_Rate-A1SH_REC**

68.   M9_KeyDays_All_RT_All_REC

69.   M9_KeyDays_All_RT_Rate-A3_REC

70.   M9_KeyDays_All_System_All_REC

(c)   Parameters (Demand at System Peak, Load Factor at System Peak, etc.) estimated with falsified Data and used in allocation Schedules

1.   M9_Statistics_All_E1_All_REC

2.      M9_Statistics_All_E1_Rate-E1_REC

3.      M9_Statistics_All_GML_All_REC

4.      M9_Statistics_All_GML_Rate-L1_REC

5.      M9_Statistics_All_GP_All_REC

6.      M9_Statistics_All_GP_GPGEI_REC

7.      M9_Statistics_All_GP_GPGMP_REC

8.      M9_Statistics_All_GP_Rate-GP_REC

9.      M9_Statistics_All_GPD_All_REC

10.     M9_Statistics_All_GPD_GPD1GEI_REC

11.     M9_Statistics_All_GPD_GPD1GFM_REC

12.     M9_Statistics_All_GPD_GPD1GI_REC

13.     M9_Statistics_All_GPD_GPD1GMP_REC

14.     M9_Statistics_All_GPD_GPD2GEI_REC

15.     M9_Statistics_All_GPD_GPD2GFM_REC

16.     M9_Statistics_All_GPD_GPD2GI_REC

17.     M9_Statistics_All_GPD_GPD2GMP_REC

18.     M9_Statistics_All_GPD_GPD3GEI_REC

19.     M9_Statistics_All_GPD_GPD3GFM_REC

20.     M9_Statistics_All_GPD_GPD3GMP_REC

21.     M9_Statistics_All_GPD_Rate-GPDP_REC

22.     M9_Statistics_All_GPD_Rate-GPDS_REC

23.     M9_Statistics_All_GPD_Rate-GPDT_REC

24.     M9_Statistics_All_GPDROA_All_REC

25.     M9_Statistics_All_GPDROA_GPDROA1GEI_REC

26.     M9_Statistics_All_GPDROA_GPDROA2GEI_REC

27.     M9_Statistics_All_GPDROA_GPDROA3GEI_REC

28. M9_Statistics_All_GPDROA_GPDROA3GFM_REC

29. M9_Statistics_All_GPDROA_Rate-GPDROAP_REC

30. M9_Statistics_All_GPDROA_Rate-GPDROAS_REC

31. M9_Statistics_All_GPDROA_Rate-GPDROAT_REC

32. M9_Statistics_All_GPROA_All_REC

33. M9_Statistics_All_GPROA_GPROAGEI_REC

34. M9_Statistics_All_GPROA_Rate-GPROA_REC

35. M9_Statistics_All_GS_All_REC

36. M9_Statistics_All_GS_GSGEI_REC

37. M9_Statistics_All_GS_GSGMP_REC

38. M9_Statistics_All_GS_Rate-GS_REC

39. M9_Statistics_All_GSD_All_REC

40. M9_Statistics_All_GSD_GSDGEI_REC

41. M9_Statistics_All_GSD_Rate-GSD_REC

42. M9_Statistics_All_GSDROA_All_REC

43. M9_Statistics_All_GSDROA_GSDROAGEI_REC

44. M9_Statistics_All_GSDROA_Rate-GSDROA_REC

45. M9_Statistics_All_GSG_All_REC

46. M9_Statistics_All_GSG_Rate-CGP_REC

47. M9_Statistics_All_GSG_Rate-CGS_REC

48. M9_Statistics_All_GSG_Rate-CGT_REC

49. M9_Statistics_All_GSROA_All_REC

50. M9_Statistics_All_GSROA_GSROAGEI_REC

51. M9_Statistics_All_GSROA_Rate-GSROA_REC

52. M9_Statistics_All_GU_All_REC

53. M9_Statistics_All_GU_Rate-UNM_REC

54.   M9_Statistics_All_GUL_All_REC

55.   M9_Statistics_All_GUL_Rate-GUL_REC

56.   M9_Statistics_All_NON_All_REC

57.   M9_Statistics_All_NON_Rate-150_REC

58.   M9_Statistics_All_NON_Rate-ALP_REC

59.   M9_Statistics_All_RS_All_REC

60.   M9_Statistics_All_RS_Rate-A1A_REC

61.   M9_Statistics_All_RS_Rate-A1SH_REC

62.   M9_Statistics_All_RT_All_REC

63.   M9_Statistics_All_RT_Rate-A3_REC

64.   M9_Statistics_All_System_All_REC

85.   The Defendants failed to produce to the MPSC the fraudulently developed **daily kilowatt demand curves (LOAD PROFILES)** provided in excel formatted spreadsheets for each rate, which they have produced and used for 2010 cost of service period and 2011 rate case U-16794.   Those results were used by Defendants in the development of cost allocation schedules and in the derivation of electricity rates and other charges, and the statistics and load profiles are maintained in Consumers Energy's annual load research "results" folder, **yet Defendants failed to provide that information to the MPSC after the MPSC made a request for that information** (and Consumers Energy claimed they did not have certain LOAD PROFILES **yet they did have** these LOAD PROFILES, they just did not want to produce that information, i.e., the residential space heating key statistics and-or load profile and sample site information).  There are load profiles and key statistics reports for each sectors (associated legacy rate

code)—various versions—in the respective customer classes that are maintained by Consumers Energy, and their respective voltage levels which are also maintained by Consumers energy, where applicable, as listed above in paragraph 81 and as listed below:

a.    E-1

b.    UNM (GU)

c.    GUL

d.    150 (GR)

e.    ALP

f.    A1A (RS)

g.    A3 (RT)

h.    GSROA

i.    GSROAGEI

j.    GSDROA

k.    GSDROAGEI

l.    GPROA

m.    GPROAGEI

n.    GSD

o.    GSDGEI

p.    L-1 (GML)

q.    GP

r.    GPGEI

s.    GPGMP

t.    GS

u.    GSGEI

v.       GSGMP

w.      CGT

x.       CGS

y.       CGP

z.       GPDT

aa.     GPD1

bb.     GPD1GEI

cc.     GPD1GFM

dd.     GPD1GI

ee.     GPD1GMP

ff.      GPDS (GPD2)

gg.     GPD2GEI

hh.     GPD2GFM

ii.      GPD2GI

jj.      GPD2GMP

kk.     GPDP (GPD3)

ll.      GPD3GEI

mm.    GPD3GFM

nn.     GPD3GMP

oo.     GPDROAT (GPDROA1)

pp.     GPDROA1GEI

qq.     GPDROAS (GPDROA2)

rr.      GPDROA2GEI

ss.     GPDROAP (GPDROA3)

tt.      GPDROA3GEI

uu.     GPDROA3GFM

86.    Based upon the failure of the defendant Consumers Energy to provide a

sufficient response to the MPSC September 2011 discovery-audit request(s),

MPSC Administrative Law Judge Sharon L. Feldman expanded the

recommendation to the Commission which required the company to respond to

the issues delineated in the September 2011 discovery request <u>in all future rate</u>

<u>cases</u>. Judge Feldman stated in section E of the Proposal For Decision of MPSC

rate case U-16794, entitled, Staff Request for Cost of Service Study Information,

"Mr. Putnam also testified to Staff's request that the company be directed to

provide additional information regarding its cost of service study allocations:

In the Company's current filing there is no testimony or exhibits detailing the

development of allocation factors. The company is using a three year average of

what it calls historical data by the Company does not include any information

regarding the development of the historical data. Because of the complexity

related to the development of allocation factors, <u>it makes it extremely difficult if</u>

<u>not impossible for the Staff and other intervening parties to determine the</u>

**legitimacy** <u>of the allocation factors through audit and discovery requests alone.</u>

<u>But requiring the company to explain, in great detail, the development of the</u>

<u>allocation factors, it will significantly reduce this burden.</u>

He further described the information Staff seeks:

The Staff recommends that in all future rate case filings the Utility should be

required to file testimony and exhibits and provide work papers, which explain

and illustrate in great detail, how the historical and test year allocation factors were developed. This should include, but is not limited to, describing which rate class allocation factors are based on samples and which rate class allocation factors are based on a census. For the class allocation factors that are developed from a sample, the Utility should illustrate through testimony, exhibits and work papers, with all the appropriate statistical information, how the samples were expanded to properly represent the classes as a whole as well as how they were transformed into allocation factors. For the class allocation factors that are developed from a census, the company should illustrate how the census was transformed into allocation factors."

87.   On June 7, 2012, the Michigan Public Service Commission issued a final order in the case U-16794 adopting the recommendations contained in the Proposal for Decision regarding the development of the Company's allocation factors.   On pages 109 and 110, in section C, entitled, "Other Cost of Service Issues", the relevant portion states,

"The Commission adopts the findings and recommendations contained in the PFD and adds that with respect to COSS information, allocation factors, and rate design, in future rate case filings, the Commission expects the company to submit supporting testimony and exhibits with detailed explanations and justification for any proposed changes."

88.   In response to the September 2011 MPSC discovery request, Consumers Energy failed to provide any underlying data identified as load or billing data from

the years 2008 and 2009 used in its load research studies for the 2011 rate case U-16794 even though defendants stated in sworn testimony that they used 3 years of "historical" data in the development of cost allocation factors.

89.   In addition to not providing *any* data identified as "historical" load or billing data from 2008 or 2009, Consumers Energy also failed to provide the cleaned and formatted versions of the limited and incomplete 2010 data that it did submit to the MPSC.

90.   Although consumers Energy Company provided raw text files for some of its 2010 data used in its load research analysis, it failed to provide the SAS formatted data to the MPSC— however, the same files can be provided in Microsoft Excel format, and should have been provided in that fashion.

91.   Consumers Energy did not provide to the MPSC the Excel version of the load profiles that it maintained in its load research shared network folder and external hard drives for sectors among its customer classes.

92.   Based on the two previous excerpts from the MPSC ALJ's Proposal for Decision and the Final Order from MPSC rate case U-16794, the Commission's order clearly instructs Consumers Energy to provide Cost of Service Study information to which the company responded in its "Load Study Refresh Proposal" with a plan to mislead, deceive and lie to MPSC staff and regulators.

93.   Consumers Energy failed to identify the production interval <u>load</u> data, non-jurisdictional data and other extraordinarily high electricity use customer account

and interval data (Wholesale for Resale, Purchase and Interchange Power, Cogeneration, General Primary etc.) fraudulently misused in their electric load studies for the 2011 rate case U-16794, prior electric rate cases and other regulatory filings.

94.     Consumers Energy Company failed to provide to the MPSC the formatted underlying billing data files from 2010, 2008 and 2009 that it used in the development of the total annual sales figures and in the derivation of its cost allocation schedules.  However the load studies results produced using these files were used by Consumers Energy to derive the allocation schedules used in its prior and current rate cases and other regulatory filings.

95.     By failing to identify fraudulently used production interval data, and non-jurisdictional data (Wholesale for Resale, Purchase and Interchange Power, Cogeneration, General Primary etc.) and other extraordinarily high electricity use customers sales and interval data in their submission to the MPSC, Consumers Energy willfully hid and covered up the fact that they developed their load profiles, cost allocation schedules and billing determinants for their electric rate design using fraud and mislead regulators on how their load research sample statistics (i.e., average use per customer, average demand per customer) were produced.

96.     Defendant Consumers Energy falsified its testimony submitted to the MPSC in its current general rate case U-17087.

97. In its "load study refresh proposal" from July 2011, Consumers Energy Vice President Ronn Rassmussen, who approved the proposal, Rates Department Executive Director Michael Torrey, Director Stephen Stubleski and others developed a plan to deceive and mislead the MPSC about the true status of their load research sample, as I explained to the MPSC in my Complaint dated July 20, 2012, Case No. U-17062.

98. In the load study refresh proposal, Consumers Energy falsely states that it lost the rate code identification numbers for its sample customers.

99. *CONSUMERS ENERGY DELIBERATELY HID AND-OR ELIMINATED THE RATE-SECTOR CODES FROM ITS SAP AND OTHER COMPUTER INFORMATION SYSTEMS IN ORDER TO PLAN AND CARRY OUT FRAUD AGAINST (all Plaintiffs) ITS RATE PAYERS, THE STATE OF MICHIGAN AND THE UNITIED STATES GOVERNMENT.*

100. Consumers Energy utilized the "need" to upgrade its computer information systems, particularly is billing systems, as a means of developing an excuse of "losing" information such as legacy rate codes in order to mislead regulators about their fraudulent activities.

101. Consumers Energy Company, as well as its co-conspirator KEMA Consultants, maintains backup files and the current and past status of current and expired customer accounts, including but not limited to their respective rate codes, in various repositories of the defendant companies, Consumers Energy and RLW

Analytics—as specified in its February 12, 2007 Load Research Services contract with Consumers Energy.

102.  Consumers Energy compiles an "Electric Sales By Rate Report," with original and altered sales figures, which identifies the revenues, variances, losses and profits for each of its rates and-or sectors within the respective jurisdictional and non-jurisdictional customer classes, including but not limited to the residential and large and Small commercial and industrial business customer classes identified in previous paragraphs in this complaint, i.e., paragraph 82.

103.  Contrary to statements made to the MPSC and in responses to the motion for reconsideration in Jackson County Circuit Court Case 12-2235-CD KEMA-RLW along with Consumers developed cross reference files and custom programs written in SAS to transfer account identification information including the account type such as Survey/Load Leading Accounts, CBS Billing Accounts (which contained all electric metered—MV90 type meters—accounts and all electric un-metered accounts—non-MV90 type meters), Cost of Service Accounts (Transmission Transaction Accounts and METC customers whose account number and other account related information was cross-referenced to each of the "associated" MV90 process ids) and CA Main Billing Accounts; and, the account number and other account related information such as the meter number, process id, rate, rate code, and voltage level, from the Defendant's legacy billing systems to SAP. In addition, According to the defendant company's "Cost of Service, The Big Book of COS",  the section entitled, "Kema Load

Research System, RLW LRS Process and Notes" the section entitled, "Load Research Steps: Reprocessing," the company identifies both the customer population billing data and cross reference meter id by rate and voltage. In fact, in the "RLW Cost Study Data Requirements" report,RLW identifies the rate code field as a 6 position field in each of the load study customer's MV90 Customer Header data layout. The SAS programming code captures and transfers this information to the dataset as well.

104. In emails and meeting notes from 2007, Eric Keaton, Carol Demlow, Charles Belknap and others communicated with Mr. Curt Puckett and other professionals at RLW Analytics about the development and implementation of the cross reference and account matching process which occurred when the Defendant switched from the legacy billing system to its current SAP billing system.

105. Mr. Eric Keaton composed an email detailing the layout and fields of the entire set of parameters and-or fields of meter and account data sent to Mr. Curt Puckett for each customer/account, including the account related information and MV90 Customer Header data layout contained in the respective customer account and interval data files.

106. Mr. Curt Puckett's email to Mr. Keaton on 8-20-2007, subject: "CMS file set up interval load data", identified the information transferred to Mr. Puckett from the metering technology Center in Consumers Energy.

107. The interval load file included

61

    a.     Site identifier

    **b.**     **RATE CODE**

    c.     Customer name

    d.     Account number

    e.     Voltage level

108.   The billing file included:

    a.     Site

    b.     **RATE CODE**

    c.     Customer name

    d.     Account number

    e.     Voltage level

    f.     Class code (Numeric) and class (alpha)

    g.     Sector code (numeric) and sector (alpha)

    h.     Total kWh

    i.     Number of days

    j.     Latest read date

    k.     Maximum demand

109.   Later, emails between Mr. Keaton and Mr. Puckett confirm that identification of the different types of accounts, including which accounts are load research/survey/load leading and the fields of the accounts that were sent to and maintained by RLW Consultants as well as the Defendants.

110.   For Cost of Service Account that it used in 2007 and beyond, Consumers Energy provided to RLW:

    a.     Meter Process ID

    b.     Account Number

    c.     **RATE CODE**

    d.      Service Voltage Level Code

    e.      Meter Pointe Code

    f.      Meter Adjustment %

    g.      Consumption Date

    h.      Consumption Hour

    i.      Consumption Quantity

111.    Additional Cost of Service files contained:
    (A) Meter Process ID
    (B) Account Number
    (C) **RATE CODE**
    (D) Customer name
    (E) Customer name overflow
    (F) Customer address
    (G) Customer address overflow

112.    The CBS files contained:
    (A) Meter Process ID
    (B) Account Number
    **(C) RATE CODE**
    (D) Customer name
    (E) Meter Pointe Code
    (F) Meter Adjustment %
    (G) Consumption Date
    (H) Consumption Hour
    (I) Consumption quantity

113.    The cbs cross reference file (cbsxref) contained:
    (A) Meter Process ID
    (B) Account Number
    (C) **RATE CODE**

114.    The third CBS billing files contained
    (A) Account Number
    (B) Customer Class
    (C) TLM
    (D) SIC Code
    (E) Business Code
    (F) Meter Number
    **(G) RATE CODE**
    (H) Begin Read date

(I) End read date
(J) On-peak Consumption
(K) Off-Peak Consumption
(L) Total Consumption
(M) Max Demand
(N) Bill Demand

115.  The CA Main Billing Account File Contains:
(A) Account Number
(B) Customer Class
(C) TLM
(D) SIC Code
(E) Business Code
(F) Meter Number
(G) **RATE CODE**
(H) Begin Read date
(I) End read date
(J) On-peak Consumption
(K) Off-Peak Consumption
(L) Total Consumption
(M) Max Demand
(N) Bill Demand

116.  As shown in paragraphs 107 through 119, all files used in the load research study originally contained the **RATE CODE** (numeric identifier), and they are currently stored in company repositories in various backup locations, including but not limited to Metering Technology, KEMA-RLW Analytics, and Rates and Regulation department.  In fact, in the load research contract with RLW Analytics, the Data Collection and VEE provision states, "Under the Phase II aspect of this project, the project team proposes to secure the interval load data available from the MV-90 data collection platform using electronic data interchange (EDI) on a monthly, on-going basis.  The interval load research meters can be transferred more frequently, e.g., weeky, if requested by CMS Energy.  The *RLW* Statistical Analysis System (SAS) data warehouse will be used to store <u>generational</u>

<u>datasets</u> and will be updated monthly.   <u>Backups</u> are performed on a 5-day rotation, with a full backup taken Monday-Friday on a ARC Serve 2000 system. For this project RLW will maintain a hot backup site in Sonoma, CA that maintains <u>fully redundant data, at all times, on a backup file serve</u>.   <u>Monthly backups are also performed and maintained off-site</u>. . ."

117.   Plaintiff Anderson was notified when defendant Eric Keaton retrieved software programs and other data maintained by RLW during the course of his employment with Defendant Company Consumers Energy.

118.   In addition, Defendant Consumers Energy maintains an Excel Spreadsheet entitled "sectors" in the 2009 load research files which give the exact counts of the various types of customers associated with each rate code and sector.   The file also summarizes and delineates the number of various types of customers in/from each billing system; including, the RCCD (rate class code) and the associated customer count, the SAP__RCCD and the associated legacy customer count, the rate, rate description, classcd or class code, class, sectorcd—sector code, and sector (e.g. residential customers with electric space heating is a sector).

119.   Residential, Secondary, Primary, Lighting, GSG and Non-jurisdictional, legacy and SAP customer class, rates, rate description and rate codes—mapped to current sectors are found in the "sectors" spreadsheet maintained by the company are below:

| Rate Code | Rate | Description | Class |
|---|---|---|---|
| 008 | A-3 | Time of Day Farm | RES |
| 009 | A-3 | Time of Day Space Heating | RES |
| 010 | B | General Secondary | COM |
| 011 | C | General Secondary | COM |
| 013 | GH | Space Heating | COM |
| 014 | H | Water Heating | COM |
| 015 | R-1 | General Secondary Resale | COM |
| 016 | R-2 | General Secondary Resale | COM |
| 017 | R-3 | General Primary Resale | COM |
| 018 | D | General Primary | COM |
| 020 | B | General Secondary | IND |
| 021 | C | General Secondary | IND |
| 023 | GH | Space Heating | IND |
| 024 | H | Water Heating | IND |
| 025 | R-1 | General Secondary Resale | IND |
| 026 | R-2 | General Secondary Resale | IND |
| 027 | R-3 | General Primary Resale | IND |
| 028 | D | General Primary | IND |
| 032 | F | General Primary | COM |
| 033 | F | General Primary | IND |

| 034 | I | Interruptible | IND |
|-----|---|---------------|-----|
| 035 | I | Interruptible | COM |
| 036 | J | Electric Furnace | COM |
| 037 | J | Electric Furnace | IND |
| 038 | I | Interruptible | IND |
| 039 | E-1 | Economic Development | IND |
| 041 | B-1 | General Primary | COM |
| 042 | B-1 | General Primary | IND |
| 061 | L-3 | Incandescent Street Lighting | COM |
| 062 | L-2 | Incandescent Street Lighting | COM |
| 063 | L-3 | Flourescent Street Lighting | COM |
| 065 | L-3 | Mercury Vapor Street Lighting | COM |
| 066 | L-2 | Mercury Vapor Street Lighting | COM |
| 067 | L-1 | Energy Only Street Lighting Secondary Unmetered | COM |
| 068 | L-3 | High Pressure Sodium Street Lighting | COM |
| 069 | L-3 | Metal Halide | COM |
| 070 | L-2 | Metal Halide | COM |
| 075 | L-2 | High Pressure Sodium Street Lighting | COM |
| 076 | UR | Unmetered | COM |
| 077 | PS-1 | Pumping Service Secondary | COM |
| 078 | PS-2 | Pumping Service Primary | COM |

| 079 | PS-3 | Pumping Service Optional | COM |
| 130 | WS | Wholesale for Resale | COM |
| 131 | WS | Wholesale for Resale | COM |
| 136 | J-1 | Alt Metal Melting Primary <30,000 kW | IND |
| 137 | J-1 | Alt Metal Melting SubTrans <30,000 kW | IND |
| 138 | J-1 | Alt Metal Melting Trans <30,000 kW | IND |
| 150 | GR | Grand Rapids Street Lighting | COM |
| 165 | L-4 | HP Sodium Area Lighting | COM |
| 166 | L-4 | HP Sodium Area Lighting | IND |
| 167 | L-1 | Energy Only Street Lighting Primary Metered | COM |
| 168 | L-1 | Energy Only Street Lighting Secondary Metered | COM |
| 175 | L-4 | HP Sodium Area Lighting | COM |
| 176 | L-4 | HP Sodium Area Lighting | IND |
| 181 | CG | Cogeneration Secondary | IND |
| 182 | CG | Cogeneration Primary | IND |
| 200 | A-1 | Residential Service without Water Heating | RES |
| 201 | A-1 | Residential Service with Water Heating | RES |
| 202 | A-4 | Alt Residence Service without Water Heating | RES |
| 203 | A-4 | Alt Residence Service with Water Heating | RES |

| 204 | A-5 | Farm Service without Water Heating | RES |
|-----|-----|-----|-----|
| 205 | A-5 | Farm Service with Water Heating | RES |
| 206 | A-1 | Senior Citizen without Water Heating | RES |
| 207 | A-1 | Senior Citizen with Water Heating | RES |
| 230 | A-1 | Residential Service with Space Heating | RES |
| 231 | A-1 | Residential Service with Water & Space Heating | RES |
| 234 | A-5 | Farm Service with Space Heating | RES |
| 235 | A-5 | Farm Service with Water & Space Heating | RES |
| 236 | A-1 | Senior Citizen with Space Heating | RES |
| 237 | A-1 | Senior Citizen with Water & Space Heating | RES |
| 238 | A-4 | Alt Residence Service with Space Heating | RES |
| 239 | A-4 | Alt Residence Service with Water & Space Heating | RES |
| 436 | J-1 | Alt Metal Melting Primary >30,000 kW | IND |
| 437 | J-1 | Alt Metal Melting SubTrans >30,000 kW | IND |
| 438 | J-1 | Alt Metal Melting Trans >30,000 kW | IND |
| 510 | ROA-S | Time of Use B Secondary | COM |
| 511 | ROA-S | Time of Use C Secondary | COM |
| 513 | ROA-S | Time of Use GH Space Heating | COM |
| 514 | ROA-S | Time of Use C 100kW gaurantee Secondary | COM |

| 517 | ROA-P | Time of Use R-3 Resale | COM |
| 518 | ROA-P | D Primary (Primary, Sub or Trans) | COM |
| 520 | ROA-S | Time of Use B Secondary | IND |
| 521 | ROA-S | Time of Use C Secondary | IND |
| 522 | ROA-S | Time of Use C 100kW gaurantee Secondary | IND |
| 528 | ROA-P | D Primary (Primary, Sub or Trans) | IND |
| 532 | ROA-P | F Primary (Primary, Sub or Trans) | COM |
| 533 | ROA-P | F Primary (Primary, Sub or Trans) | IND |
| 537 | ROA-P | J Primary (Primary, Sub or Trans) | IND |
| 541 | ROA-P | B1 Primary (Primary, Sub or Trans) | COM |
| 542 | ROA-P | B1 Primary (Primary, Sub or Trans) | IND |
| 700 | A-5 | Life Support without Water Heating | RES |
| 701 | A-5 | Life Support with Water Heating | RES |
| 709 | B | General Secondary Billboards Dusk/Dawn | COM |
| 710 | B | General Secondary Billboards Fixed Hours | COM |
| 716 | R-2 | General Secondary Resale 100kW guarantee | COM |
| 721 | C | General Secondary 100kW guarantee | IND |
| 726 | R-2 | General Secondary Resale 100kW guarantee | IND |
| 730 | A-5 | Life Support with Space Heating | RES |

| 731 | A-5 | Life Support with Water & Space Heating | RES |
| 741 | C | General Secondary 100kW guarantee | COM |
| 881 | SC | Ramco Gershenson Properties | COM |
| 895 | SC | Solvay America, Inc | IND |

120. Additional corresponding rate codes (and related sector codes) and rate lists maintained by Defendant Consumers Energy in one of the 2009 sample files shown below follows:

| rate1cd | rate1 |
|---------|-------|
| 2 | Rate-A3 |
| 3 | Rate-A4 |
| 4 | Rate-A5 |
| 10 | Rate-B |
| 11 | Rate-C |
| 13 | Rate-GH |
| 14 | Rate-H |
| 15 | Rate-R1 |
| 16 | Rate-R2 |
| 39 | Rate-E1 |
| 61 | Rate-L1 |
| 76 | Rate-UNM |

71

| | |
|---|---|
| 77 | Rate-PS1 |
| 78 | Rate-PS2 |
| 101 | Rate-A1A |
| 102 | Rate-A1B |
| 103 | Rate-A1C |
| 150 | Rate-150 |
| 151 | Rate-EDSU |
| 152 | Rate-ALP |
| 165 | Rate-L4 |
| 171 | Rate-R3P |
| 172 | Rate-R3S |
| 173 | Rate-R3T |
| 181 | Rate-DP |
| 182 | Rate-DS |
| 183 | Rate-DT |
| 321 | Rate-FP |
| 322 | Rate-FS |
| 323 | Rate-FT |
| 361 | Rate-JP |
| 362 | Rate-JS |
| 382 | Rate-IS |
| 383 | Rate-IT |

| 411 | Rate-B1P |
| 412 | Rate-B1S |
| 413 | Rate-B1T |
| 510 | Rate-510 |
| 511 | Rate-511 |
| 513 | Rate-513 |
| 514 | Rate-514 |
| 517 | Rate-517 |
| 518 | Rate-518 |
| 520 | Rate-520 |
| 521 | Rate-521 |
| 522 | Rate-522 |
| 528 | Rate-528 |
| 532 | Rate-532 |
| 533 | Rate-533 |
| 537 | Rate-537 |
| 541 | Rate-541 |
| 542 | Rate-542 |
| 711 | Rate-CATV |
| 791 | Rate-PS3P |
| 792 | Rate-PS3S |
| 793 | Rate-PS3T |

| | |
|---|---|
| 1361 | Rate-J1P |
| 1362 | Rate-J1S |
| 1363 | Rate-J1T |
| 1821 | Rate-CGP |
| 1822 | Rate-CGS |
| 1823 | Rate-CGT |
| PPI | IPP |
| PP2 | IPP |
| PPI7 | IPP |
| WR | WFR |

121.   Consumers Energy maintains original class codes and classifications as well

| class1 cd | class1 |
|---|---|
| 1 | RS |
| 2 | RT |
| 3 | GS |
| 4 | GSD |
| 5 | GP |
| 6 | GPD |
| 7 | GSG |
| 8 | GML |

74

| 9  | GUL |
|----|-----|
| 10 | NON |
| 11 | GU  |

122. In their response to the MPSC's September 2011 discovery requests, Consumers Energy violated Rule 31 of the Michigan Department of Commerce Public Service Commission, Preservation of Records of Electric, Gas, and Water Utilities, and the Public Utility Regulatory Policies Act of 1978 section 133 (a) as **they failed to provide to the MPSC the software and cross reference files necessary to format and link the data** with the respective accounts that Defendants used in the samples to perform the load research study.

(Applicable Federal and State regulations require that this information be retained and submitted—*all* nonexempt utilities must abide by 18 C.F.R. § 290.102 which refers to PURPA section 133(a)—to the MPSC upon request. Defendants were aware of the regulations as they provided Plaintiff Anderson with a copy of them one month after he began working at the defendant company. Code of Federal Regulations, Title 18: Conservation of Power and Water Resources, 125.3 - Schedule of records and periods of retention. The "Information Technology Management" Section 5 states, and the corresponding rule in Michigan Regulations 460.2531 "Automatic data processing records (retain original source data used as input for data processing and data processing report printouts for the applicable periods prescribed elsewhere in the

schedule).  Software program documentation and revisions thereto.  Retain as long as it represents an active viable program or for periods prescribed for related output data, whichever is shorter."

The **Michigan Department of Commerce Public Service Commission**, Preservation of Records of Electric, Gas, and Water Utilities, R 460.2531, "Automatic data processing record; retention periods," contains language similar to the federal regulations.  Rule 31, section 1, part (b), states, "**[software] program documentation and revisions thereto.  Retain as long as it represents an active viable program or for periods prescribed for related output data, whichever is shorter.**"  Section 2 states, "**Original source data used as input for data processing and data processing report printout shall be retained for the applicable periods prescribed elsewhere in the schedule.**"

123. If defendant Consumers Energy had provided the cross reference files and formatted data sets used in the derivation of cost allocation schedules, the MPSC load research professionals potentially could have analyzed some of the underlying data used by Consumers Energy Company to develop their demand and energy data used to derive fraudulently inflated sales and fraudulently derived cost allocation schedules submitted by Defendant Consumers Energy in past and current MPSC rate cases.

124. Defendants created a new file LRS.SAS (software program) in the beginning of the year 2012 to process the data to be used to perform the load research

studies. Defendants gave that new file LRS.SAS to Plaintiff Anderson for him to conduct analyses as a basis for testimony to the MPSC, yet prior to year 2012, Defendants used the software program RLW.SAS.

125. The RLW.SAS software was used to process the fraudulent data, and it identifies all of the data files/data sets containing the phony accounts that were used in samples and to develop the fraudulent sales figures.

126. The RLW.SAS software at Consumers Energy is the main file that produces the load research results, including the key statistics and load profiles for various rates-sectors, like A1A-Residential and A-1SH—which has not been identified for the MPSC.

127. The RLW.SAS software was never produced to the MPSC by Consumers Energy, but it should have been produced, and explained in detail as to how it was used to produce the cost allocation schedules.

128. Consumers Energy failed to report to the MPSC the true number of accounts used in U-16794 to develop the sales figures for the Electric Space Heating customers.

129. In his testimony to the MPSC in rate case U-17087, Mr. Eric Keaton provided false statements about the statistical method used to calculate the aggregate and average amount of electricity used by Residential Electric space heating customers in case U-16794.

130. According to the company's own Load research study Billing file summary used in the 2010 load research study, Consumer's Energy used a Mean Per Unit (average use per account) statistical method to fraudulently develop the amount of electricity fraudulently attributed to Residential Electric Space Heating customers (A-1SH sector).

131. If Consumers Energy had given the proper testimony about the statistical method, regulators at the MPSC would have been able to discern that billing data was falsified as the Defendant company used figures up to 25,000,000 kWhs for individual accounts in the billing file in order to fraudulently inflate the average amount of electricity used by Residential Electric Space Heating customers and residential customers as a whole.

132. In addition Defendants used a ratio estimation statistical method to calculate the class demands of its sampled rate classes.

133. In a Consumers Energy Memorandum entitled Board Report Information and Returns created by James Fraga EP12-463 on 2.24.2011 and sent to LLmountcastle, PJ MacAndrews,JMShore and carbon copied to Stephen Stubleski, Michael Torrey and Anne Rogus, Consumers Energy reported Electric Space Heating Revenues at the peak of winter in 2009 and 2010.

134. For the period of December 2009, Consumers Energy reported Electric Space Heating Revenues for residential customers were -$1,000.00 and (0) for December of 2010. (The spreadsheet "sectors" from paragraph 119 shows that

there were only, at most, 10 residential space heating customers identified in defendant's legacy billing system.)   If you refer back to paragraph 81 in this Complaint, Section C, line 61, it shows that Defendants used falsified energy amounts for Residential Electric Space Heating customers, that report being; M9_Statistics_All_RS_Rate-A1SH_REC.

135.   The Consumers Energy report CE 3-020 entitled Total Electric Revenues, Actual/Actual, kWh dated 1.18.2011 shows that Consumers Energy failed to collect an amount anywhere near the amount it claimed from sales of approximately 1 Billion kwh of electricity to residential Electric Space heating customers.

136.   In the "Sector_Use Summary" Excel Spreadsheet, the defendant Consumers Energy delineates its fraudulent recoding and fabrication of residential electric space heating accounts from the original 10 accounts to more than 70,000 accounts (dozens of accounts in the sapbilling2010 file contain exactly the same information including name and annual use) and from $0 in revenue—and by deduction 0 kWhs of electricity— to millions of dollars from residential customers based on phantom residential "space heating" customers and hundreds of millions of units (kWhs) of electricity use.  (Consumers Energy has perpetrated this type of fraud upon other sectors among its customers as well.  Defendants knew from day one that they made no money from Residential Space Heating Customers because they do not have very many Residential Space Heating

Customers, so they manufactured 70,000 accounts in order to inflate the sales levels of the residential customer class.)

137. In his testimony, Mr. Eric Keaton claimed to have estimated the number of Electric Space Heating customers based upon a Residential Saturation Survey (survey which supposedly used a large sample to estimate the percentage of customers who use electricity for different household appliances, i.e., Air conditioning, electric space heating, electric water heating) performed by A and K Associates (principal, Alan Benedict).

138. Based upon this internal memo of Consumers Energy, Board Information Report and Returns, the summary results workbook and the sectors spreadsheet alone, Consumers Energy conspired with Allan Benedict to falsify the survey results.

139. Defendants also falsified the identity of the Residential Space Heating customers in their 2010 load research study as shown in the "sapbilling2010" file.

140. William Ware, lead company statistician and market research statistician oversaw the production of the residential saturation survey.

141. According to Plaintiff Anderson's conversations with William Ware, Consumers Energy Marketing Research frequently employed the services of A and K Associates.

142.   During Plaintiff Anderson's interaction with William Ware, Mr. Ware refused to release the names of the participants in the residential saturation survey claiming they were subject to confidentiality clauses.

143.   Mr. Ware was fully aware of the absence of Residential Electric space heating customers as he coordinated with Rates and Regulation to develop a cover up sample to be used in MPSC rate cases U-16794 and U-17087.

144.   Mr. Ware established the relationship with Cadmus Consultants to put the cover-up residential sample in place by originally, falsely claiming to Plaintiff Anderson, along with Defendants Michael Torrey and Stephen Stubleski that a new sample for smart meters needed to be developed by Plaintiff Anderson.

145.   Mr. Ware was aware of the relationship that CECo had with KEMA-RLW Consultants to perform the work with the residential "sample" using smart meters.

146.   Mr. Ware of Marketing research, Vice President Ronn Rassmussen, Vice President Patti Poppe, Teri Van Summeren (former load research professional at Consumer's Energy) Stephen Stubleski, Michael Torrey and CEO John G. Russell in an email sent 10-12-2011 participated in approving the cost of a new sample for the residential class which would be used to cover up the fraud.

147.   CEO John G. Russell approved $350,000 to put the new sample for the residential and commercial and industrial classes in place to cover up past fraud.

148.  Mr. Ware and Ms. Teri Van Sumeren oversaw the hiring of Cadmus Associates to develop a cover up residential "sample" for which Consumers Energy hand-picked the participants and their interval data and for which Standard Industry Practices were not used to develop.  (Plaintiff Anderson personally witnessed the hand picking of those participants).

149.  Consumers Energy failed to identify for the MPSC the original approximately 580 sample participants in the residential load study sample (which included data from production interval data, and non-jurisdictional data (Wholesale for Resale, Purchase and Interchange Power, Cogeneration, General Primary etc.) and other extraordinarily high electricity use level customers, that were used to develop the average electricity use per customer and average demand per customer statistics.

150.  Kimberly Michner, Consumers Energy data-database specialist, failed to identify to Plaintiff Anderson, upon his request, the origin of the non-residential class data and accounts fraudulently used in the residential sample to inflate the sales and demands of residential customers.

151.  Cadmus associates were given approximately 400 accounts to develop an analysis of the residential "sample" for Consumers Energy.

152.  Still, among the 400 accounts, Matei Perussi, programmer for Cadmus, identified interval data which did not belong in the residential sample.  Upon that revelation, Plaintiff Anderson cross referenced the process I. D., and matched the origin of

the inflated data back to interchange, wholesale, production level and other extraordinarily high electricity usage accounts.

153.  Stephen Stubleski instructed the Load research analysts, Eric Keaton and trainee Plaintiff Anderson to "throw out" those accounts that were used to inflate the average electricity use per customer and average demand per customer figures in the residential sample.  (In an email from April 19, 2012, after plaintiff Anderson pointed out the inclusion of falsified data in the residential sample, Defendant Stephen Stubleski wrote, "Simeon, what I'm asking is for the other Rate's employees to understand why we asked Cadmus to conduct this survey. The items you describe under #1 won't do that.  Why don't you just simply explain why we asked Cadmus to conduct the survey—what were we trying to accomplish.  **If you need to point out that there were some anomalies that had to be addressed**, then by all means, please do so.  **But I personally don't think that adds any value to this discussion**.")

154.  Plaintiff Anderson was told by department management that he would be testifying in the upcoming MPSC rate case U-17087 about the development of the residential "sample" now recognized as an effort to cover up past and ongoing fraud of Defendant Consumers Energy.

155.  Plaintiff Anderson's immediate supervisor, Stephen Stubleski, made him responsible for developing and writing testimony regarding the development of the company's allocation factors based upon a fraudulently developed residential sample in MPSC case U-17087.

156.   With respect to maintaining financial and electricity sales data, Plaintiff Anderson
       was made responsible for Sarbanes-Oxley compliance without his knowledge by
       Stephen Stubleski and without training being scheduled or discussed as an
       option by Defendant Consumers Energy management.   (Plaintiff Anderson was
       given a written document by Steve Stubleski outlining Mr. Anderson's goals,
       objectives and responsibilities which did not include him being responsible for the
       Sarbanes-Oxley compliance.   Through the suggestion of Plaintiff Andersons
       team mates, he was told that he might want to go online to pull up his goals,
       objectives and responsibilities with Consumers Energy.   Plaintiff Anderson then
       went online as told he could do by his team mates and found a different set of
       goals, objectives and responsibilities that held him responsible for the Sarbanes-
       Oxley compliance.)

157.   Defendant Eric Keaton and Defendant Steve Stubleski gave Plaintiff Anderson a
       training manual in February of 2012 that did not properly identify the statistical
       methods used by Consumers Energy to perform the load research study.   If
       Plaintiff Anderson was given the proper training manual, Mr. Anderson could
       have easily determined that Defendants used fraudulent data to derive their sales
       and demand levels and electricity rates.  Defendants wanted Plaintiff Anderson to
       prepare testimony with false statements as to how they conducted the load
       research and as to how their cost allocation schedules were developed, yet
       attempting to keep Plaintiff Anderson believing that he was not giving false

statements, but truthful statements, in order for Defendants to continue perpetuating the fraud.

### IMPACT OF FALSIFIED/FRAUDULENT SALES

158.  With a summer electricity rate that doubles for Consumers Energy customers after 600 kWhs of electricity is used during one summer month, the impact of fraudulently increased sales levels was has been and continues to be exacerbated for residential customers during the months of June, July, August and September as Defendant Consumer Energy collected and continues to collect revenues at even faster rate using this rate design.

159.  Fraudulently increased sales levels provided Defendants a falsified justification for maintaining and expanding rate base equipment for providing service to the residential, primary, and secondary customer classes.

160.  In other words, the Defendant company accounting records stated that the company purchased and "maintained" unnecessary equipment in order to collect more revenue and to avoid paying properly assessed taxes to the Internal Revenue Service of the United States Government and the State of Michigan.

161.  Consumers Energy made purposeful decisions to purchase power at astronomical rates from the market during the times when the cost to purchase electricity were most expensive in order to collect excessive revenues, fraudulently inflate expenses, and avoid proper tax assessment levels.

162.    All of the cost allocation schedules based upon falsified/fraudulent demands and energy levels submitted to the MPSC by Defendant Consumers Energy in 2008, 2009, 2010 and 2011 rate cases and other regulatory filings were fraudulent.

163.    By overstating sales-energy to and the demands of the residential and large and small business customers, Defendant Consumers Energy overstated the size of the equipment needed to service these customers, consequently the rate of depreciation was falsely overstated and the reduction in tax levels based upon the purchase and depreciation of unnecessarily larger sized equipment was done fraudulently.

## IMPACT OF FALSIFIED DEMANDS

164.    Production and Transmission costs to the Residential, Primary, and Secondary customer classes were fraudulently increased.

165.    Using fraudulent revenue requirements and billing determinants, Consumers Energy designed fraudulent inflated rates and other related charges for the respective residential, primary and secondary customer classes.

## IMPACT OF FALSIFIED TESTIMONY

166.    Defendant Consumers Energy has continued to cover up their fraud through false testimony at the MPSC, as explained within this Complaint.

167.    Defendant Consumers Energy has continued to illegally collect excessive revenues from the Residential, Primary, and Secondary customer classes through fraudulently manufactured electricity rates and other related charges.

168. In further committing fraud, Consumers Energy used the altered load profile (demands) and falsified aggregate sales of electricity to create artificially high periods of electricity consumption—or artificial peaks—throughout the year, particularly during the summer and winter seasons of 2008, 2009, and 2010 for their residential and large and small business customers (the Class).

169. By using fraudulently developed sales, load profiles (demands) and cost allocation schedules in 2008, 2009 and 2010 Defendants Consumers Energy fraudulently and disproportionately allocated exorbitant purchase power and fuel costs to those three classes of rate payers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related costs.

170. By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy fraudulently overstated the amount of electricity that it produced for residential and large and small business class customers overall; consequently, Consumers Energy fraudulently and disproportionately allocated exorbitant business costs to these three classes of rate payers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

171. By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010 Consumers Energy fraudulently overstated the amount of electricity that it supplied to residential and large and small business class customers overall; consequently, Consumers Energy

fraudulently and disproportionately allocated exorbitant supply costs, and distribution costs, to these three classes of rate payers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

172. By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy fraudulently overstated the amount of electricity that was transmitted for residential and large and small business class customers overall and when market prices were the most astronomical; consequently, Consumers Energy   fraudulently and disproportionately allocated exorbitant transmission costs to these three classes of rate payers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

173. By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010 Consumers Energy fraudulently allocated excessive Return on Investment costs to these three classes of customers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

174. By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive Operations and Maintenance costs to these three classes of customers and fraudulently recovered excessive revenues through

fraudulently manufactured electricity rates that they designed and other related charges.

175.   By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive Depreciation costs to these three classes of customers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

176.   By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive Federal and state Tax costs to these three classes of customers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates.

177.   By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive Administrative and General costs to these three classes of customers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

178.   By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive Interest costs to these three classes of customers

and   fraudulently   recovered   excessive   revenues   through   fraudulently manufactured electricity rates and other related charges.

179.   By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive current and future investment costs to these three classes of customers and fraudulently recovered excessive revenues through fraudulently manufactured electricity rates and other related charges.

180.   By using fraudulently developed sales, load profiles (demands), and cost allocation schedules in 2008, 2009 and 2010, Consumers Energy committed fraud by allocating excessive Interest costs to these three classes of customers and   fraudulently   recovered   excessive   revenues   through   fraudulently manufactured electricity rates and other related charges.

181.   After fraudulently allocating extraordinary costs to the residential and large and small business class customers of Consumers Energy, Consumers Energy not only illegally recovered those costs through fraudulently derived electricity rates but cost recovery mechanisms and other related charges that were derived through fraud and deception as well.

182.   According to analyses completed by the Rates and Regulation Senior Analyst Hubert Miller, 75 % of Consumers Energy, rates include Power Supply costs (i.e., costs to purchase power when customer demand "peaks" and exceeds the defendant company's system output, fuel, transmission costs, Power Supply

Operations and maintenance, interest, taxes, Power Supply return on investments) and the other 25 % includes delivery costs (Delivery Operations and Maintenance, Delivery Systems Depreciation, Interest, Taxes, Delivery Return on Investment).

183.   With reasonable electricity production levels considered and additional information from Wayne E. Garrity, Senior Vice President for Consumers Energy which he explains in his "Power Supply Topical, July 20, 2011", Consumers Energy's capacity to produce electricity is not maximized and various generating or production units are not dispatched in the most economical manner which results in additional costs to residential, primary and secondary customer classes.

184.   Given the artificial "peaks" in the respective class load profiles (demands) and inflated aggregate sales figures that Consumers Energy created for the years 2008, 2009, 2010 and prior, and the non-maximized use and uneconomical dispatch of Consumers Energy's power plants or generating fleet, Consumers Energy's own analysis reveals that Purchased Power Agreements are fraudulent and unnecessary.

185.   According to Consumers Energy's 2010 Return on Equity Study, Purchased Power Agreements total $1,224,052,571.00 for 2010 and $1,151,050,805.00 for 2009 and are approximately 40 % of all the company's expenses.

186. Given the cumulative and compounded impact (the fraud continued and was compounded based upon the use of fraudulent data by Consumers Energy from one year to the next) of the fraud perpetuated by Consumers Energy, a conservative estimate of the portion of expenses for 2010 alone which are overstated for the residential and large and small business classes and recovered through the respective electricity rates and other related charges stand between 60% and 80% or more of each category, such as delivery costs and fuel costs, meaning that approximately 20% to 40% of the rates charged by Consumers Energy to each customer were legitimate charges.

187. Given the compounded and continuing nature of the fraud, a conservative approximation of the percentage of the electricity rate that is based on fraud by Consumers Energy is 60%.

188. Consumers Energy had an external hard drive for the purpose of containing the fraudulently inflated customer data in raw and formatted datasets.

189. Over the past several years, Consumers Energy fraudulently manipulated their cost allocation schedules and key statistics from load research analyses that they presented to the MPSC, and fraudulently manipulated their sales and demands figures during the time that electricity was the most expensive to produce and purchase, in order to increase their electricity rates and other related charges so that they could fraudulently charge all Plaintiffs more money so they could reap hundreds of millions of dollars in profits, all the while, hiding the fact that they were not really producing all of the electricity that they claimed to produce for the

respective customer classes and sectors delineated in paragraphs 1 to 188 of this Complaint.

190.  In further attempt to hide the fraud committed by Defendants, they retaliated against Plaintiff Anderson by filing a frivolous Counter-Complaint against him in Jackson County Circuit Court because of the allegations alleged within his Complaint he filed with the MPSC and because he filed a complaint with the MPSC, and further because of the allegations alleged within his Complaint filed in the Jackson County Circuit Court and because he filed a Complaint in the Jackson County Circuit Court.

191.  In their responses to interrogatories in the Jackson case, Defendants lied about not including and not recycling the data from interchange accounts, and other extraordinarily high electricity use level customers (Wholesale for Resale, Purchase and Interchange Power, Cogeneration, General Primary etc.) in their residential and large and small business class billing and interval data files and are attempting to cover up their fraud by requiring Plaintiff Anderson to print out data from the excessively large files that hold the data from each customer in the respective samples.

192.  In a further attempt hide their fraud, and mislead the Jackson County Circuit Court, Consumers Energy's Counsel DIANE Y. BOWER stated to the Court as to Mr. Anderson, "He's filed with the MPSC, and he sent them reams of documents that they would have no reason to want." (Transcript before the Jackson County Court dated October 23, 2012 p. 7, lines 19-21, emphasis added).

193.   Consumers Energy Counsel's statement above is false, and was an attempt to mislead the Court to obtain the relief they requested, so they could attempt to keep hidden the fraud they engaged in.

194.   The MPSC did want that information, and clearly stated so, just 6 days before the October 23, 2012 hearing before the Court:

> "Staff does note that in Consumers Energy's
> 12 last rate case, which is U-16794, it also issued
> 13 concerns with the allocation factors used, and **wanted**
> **14 more evidence** in support from the Company, and
> 15 Mr. Anderson discusses this in his response to
> 16 Consumers Energy. This, to Staff, is the **critical**
> **17 piece** that the Commission will be concerned with in
> 18 this case."
> (Transcript excerpt of MPSC hearing, on October 17, 2012, p. 23, lines 11-18, emphasis added).

195.   Another example of Defendants attempt to cover up their fraud occurred:  When discussing the matter of the MPSC's involvement and concern over the information provided to them by Mr. Anderson, Consumers Energy's Counsel (Defendant Bower) again attempted to mislead the Jackson County Court by stating, "Nothing in this transcript says that the MPSC thanks Mr. Anderson for bringing all of the material to him.  Nothing says they find any merit to his complaint, and I would like to present it to the Court."  (Transcript before the Jackson County Court dated October 23, 2012, p. 17, lines 12-15, emphasis added).  Yet, Defense Counsel never did present it to the Court.  The reason being, her statements were false, and another attempt to mislead the Court and the parties, and keep hidden the fraud, requesting the Jackson County Court to

grant injunctive relief, yet providing no proof of harm, as all data in the possession of Mr. Anderson was already forwarded to the MPSC.

196.   In direct contradiction to Consumers Energy's attorney (Defendant Bower) statements above, the attorney for the MPSC stated previously:

7        ...Staff **appreciates**

8 **Mr. Anderson bringing to its attention** its concerns

9 with Consumers Energy's cost of service study, most

10 importantly, the issue of the allocation factors that

11 were used. Staff does note that in Consumers Energy's

12 last rate case, which is U-16794, it also issued

13 concerns with the allocation factors used, and **wanted**

14 **more evidence** in support from the Company, and

15 Mr. Anderson discusses this in his response to

16 Consumers Energy. **This, to Staff, is the critical**

17 **piece** that the Commission will be concerned with in

18 this case.

19 The Commission also ordered Consumers

20 Energy to address these issues in its next filed rate

21 case. At this time the prehearing for Consumers next

22 filed rate case, which I believe is U-17087, is

23 scheduled to be on this Friday, and **I can assure**

24 **Mr. Anderson that Staff will be closely looking at this**

25 **issue in that case**.

(Transcript excerpt of MPSC hearing, on October 17, 2012, p. 23, emphasis added).

197. Defense Counsel DIANE Y. BOWER blatantly lied to the lower court, even with that transcript in hand, in an attempt to cover up the fraud of Consumers Energy as outlined herein, in furtherance of the conspiracy as outlined herein.

198. Plaintiff Anderson's Counsel did not receive a copy of that MPSC transcript until after that hearing before the Jackson County Circuit Court.

199. Plaintiff Anderson filed a Motion for Reconsideration citing to all of the false statements by DIANE Y. BOWER, showing how the court was mislead.

200. In their responses to the Motion for Reconsideration, defendants continued to lie and mislead the court in order to cover up and continue the fraud that they are engaged in.

201. As an example, the Defendant company stated to the court that it was exempt from Public Regulatory Policies Act of 1978, 16 U.S.C. section 2643 and the corresponding state regulation for Michigan, Rule 460.2531 and was not required to file individual customer level load data with the MPSC nor was it required to file the customer level load data in a way that it would be available to the public.

202. Consumers Energy is in fact *not exempt* from PURPA (as referred to in the above paragraph of this complain and delineated in paragraphs 81 through 82) nor is it exempt from the corresponding state regulations for Michigan. On the contrary, the defendant company and did in fact file 2010 customer level load data. That data is available to the public through Freedom of Information Act requests.

203.   Another example of Consumers Energy lying to the court is when it claimed that data and customer account and related account information such as the account number, meter number and other identification numbers that it filed with the MPSC were confidential.   On the contrary, the defendant company supplied within        the        "Cost_Study_MV90_Header_**Date***"        and "Cost_Study_MV90_MAIN_**Date***"   files for 2010 the process identification number, meter number,   customer account number (referred to as contract account number), installation number, legacy account number, rate class code, voltage level, meter adjustment percentage, beginning consumption date, ending consumption date, corresponding interval load data for each account and other information for sample customers; and, Consumers Energy supplied in "Cost_Study_ELEC_**Date***" files for 2010, the account number, installation fact,   legacy account number,   tlm #, sic # (business code), meter number, monthly beginning bill date, monthly end bill date, rate class code, adid, monthly on-peak consumption amount, monthly off-peak consumption amount, total monthly consumption, monthly maximum demand, and monthly billed demand for each of its approximately 1.8 Million Consumers Energy customers.

204.   Contrary to what Consumers Energy stated to the courts, this information is available to the public through a Freedom of Information Act request as well.

205.   Plaintiff Anderson also filed discovery requests, which DIANE Y. BOWER has requested the Jackson County Circuit Court strike.

206.  It is clear that Consumers Energy has something to hide, and it is believed that the MPSC is beginning to put some of the pieces together based upon what Plaintiff has provided to them.

207.  Consumers Energy pushed hard in Jackson County Circuit Court, improperly and illogically so, to take away all of the information that Plaintiff Anderson possessed a copy of, which was information that he already provided to the MPSC, in further attempt to cover up the fraud they committed.

208.  Logically, it made no sense that Consumers Energy was not concerned about keeping from the public, the information that Plaintiff Anderson provided to the MPSC, yet, Consumers Energy claimed before Judge Grant in Jackson County Circuit Court that they could not afford for that information to go public, and that is why they claimed to seek injunctive relief.

209.  Injunctive relief was never an appropriate remedy in the Anderson v Consumers Energy Jackson County Circuit court case, as there was no harm shown at all by Consumers Energy, nor could they show any harm, as for many months, that same information that they sought to take from Plaintiff Anderson in the Jackson County Circuit Court case was available to the public at the MPSC.

210.  It appears that there is more to the cover up by Consumers Energy and Diane Bower of that information than meets the eye.

211. Judge Grant then ordered the 10 discs that Plaintiff Anderson produced which contained the information sought by Consumers Energy, to go only to Consumers Energy attorney.

212. Plaintiff Anderson's attorney Guzall, filed those 10 discs in accord with MCR 2.312, which requires such be filed with the Court along with requests to admit.

213. Yet, on December 11, 2012, Judge Grant struck Plaintiff Anderson's Discovery Requests, without authority, and in violation of the Michigan Court Rules, and decided not TO EVEN ALLOW THE COURT to keep a copy of the 10 discs.

214. The Jackson County Circuit Court could easily have followed the law and SEALED those 10 discs from public view, (if public viewing was the concern of Consumers Energy, as they argued), yet, public view could not have been the real concern.

215. The Michigan Court Rules mandate that Requests to Admit be filed with the Court along with supporting documents. "Copies of the documents must be served with the request unless they have been or are otherwise furnished or made available for inspection and copying. MCR 2.312 (A).

216. The relief sought by Defendant Consumers Energy on December 11, 2012 in Jackson County Circuit Court as to striking Plaintiff's discovery requests was not even possible, pursuant to the very Court Rule they cited. In another attempt to mislead the Jackson County Circuit Court, Defendant Consumers energy stated

at page 6 of their Brief, "MCR 2.215(B) provides for striking from the Court record, any filing which is improper for a variety of reasons."

217.  Defendant Consumers Energy attempted to give the Jackson County Circuit court the impression that Plaintiff Anderson's following of the court rule MCR 2.312, allowed the Court to strike his properly filed discovery requests. Yet, MCR 2.215(B) did not allow for such relief in that case.

218.  MCR 2.215(B) states in full, "(B) Motion to Strike. On motion by a party or on the court's own initiative, the court may strike from a pleading redundant, immaterial, impertinent, scandalous, or indecent matter, or may strike all or part of a pleading not drawn in conformity with these rules."   MCR 2.115(B), emphasis added. Defendant Consumers Energy failed to argue any of those reasons listed in their Brief.   That is because MCR 2.215(B) did not allow for the relief requested by Defendant.

219.  Defendant only argued confidentiality as their reasoning for striking Plaintiff Anderson's Discovery Requests.

220.  Both the Jackson County Circuit Court and Defense Counsel for Consumers Energy acted well outside of the law.

221.  Consumers Energy brought 3 attorneys to court on December 11, 2012 to argue their motion to strike, one of whom was ERIC V. LUOMA.

222. Plaintiff Anderson has now withdrawn his MPSC complaint Case No. U-17062, as the MPSC cannot rectify or deal with inaccurate and/or fraudulent rate and other related charge issues of the past, and the MPSC staff is addressing the issue of rates and other related charges moving forward in regards to Consumers Energy.

223. Judge John McBain later denied Mr. Anderson's motion for reconsideration of Judge Grant ordering the injunction requested by Defendant Diane Y. Bower and her Client Consumers Energy.

224. Judge McBain also did not address the fact that Defendant Diane Y. Bower attempted to mislead the court by her statements as shown in this Complaint, even though Mr. Anderson's attorney raised that issue again with the Judge McBain, who heard the matter for the first time.

225. Judge McBain refused to answer why Consumers Energy should be allowed a protective order as to public information.

226. Judge McBain refused to answer why Consumers Energy should be allowed injunctive relief as to public information.

227. Judge McBain refused to answer why an evidentiary hearing was not held in regards to Consumers Energy seeking injunctive relief.

228. Judge McBain has tied the hands of Plaintiff in discovery, refusing to have Consumers Energy answer simple Interrogatories and Requests to Admit.

229.   Defendant Bower has been complicit in attempting to cover up the illegal acts of her Clients.

230.   Plaintiff Anderson has recently appealed the decision of Judge McBain in denying Plaintiff's Motion for Reconsideration, appeal # is COA 314627.

231.   Plaintiff Simeon Anderson is the original source of approximately 95% of the data he gave to the MPSC which proves his claims in this lawsuit, which includes approximately a terabyte of information, that was given to the MPSC by Plaintiff Anderson.

232.   Plaintiff also is the original source of audiotape recordings that he provided to the MPSC which shows Consumers Energy was trying to cover up the fraud.

233.   Plaintiff Simeon Anderson is the original source of the information he has provided herein to determine with factual particularity, the fraud and amount of fraud in monetary amounts that Plaintiffs have been defrauded.

234.   Plaintiff Simeon Anderson has direct and independent knowledge of the fraud that has been committed by Consumers Energy.

235.   This lawsuit is an outline showing the magnitude and details of the fraud by Consumers Energy, that only Plaintiff as a former insider (employee at Consumers Energy) possesses and can articulate.

236.   *Each Consumer's Energy sample customer's hourly electricity use information is protected through a unique internal identification number*

_known only to Consumers Energy employees as a "process ID number"._
_To any person outside of the comparatively small set of employees within_
_Consumers Energy Company, no one would be able to identify a customer_
_account." However, even this information is deemed to be public_
_information and is available through a FOIA request to the MPSC._

237. Without Plaintiff Anderson's knowledge, the details and the magnitude of the fraud as perpetrated by Consumer Energy, as plead herein, could not be determined.

238. Consumers Energy, as shown herein, has intentionally tried to prevent Plaintiff Anderson from having access to the data he obtained while working at Consumers Energy so that he would not be able to uncover the details of the fraud in order to prove his case, and prove the fraud against the Plaintiffs the United States Government, the State of Michigan, and the customers of Consumers Energy.

## MONETARY AMOUNT OF FRAUD BY DEFENDANTS AGAINST PLAINTIFF, THE U. S. GOVERNMENT

239. Consumers Energy receives approximately 25% of LIHEAP (Low Income Home Energy Assistance Program) funds awarded to Michigan.

240. 50 % of the LIHEAP funds (Low Income Home Energy Assistance Program) go towards electric bill payments.

241.   For the year 2008 Consumers Energy received approximately $17 Million for electric bill payments, in 2009 $31 Million, $32 Million in 2010, and $29 Million in 2011, for a total of $109 Million from LIHEAP electric bill payments over those years.

242.   With an approximation of 60 % of the electric rate being based on fraud by Consumers Energy, Consumers Energy has defrauded Plaintiff the United States Federal Government out of more than $65 Million as to LIHEAP electric bill payments over the years 2008, 2009, 2010 and 2011.

243.   In addition, Consumers Energy has overstated its purchased power expense, fuel expense, depreciation expense and other expenses thereby depriving the United States Federal Government of tax revenue.

244.   By fraudulently overstating electric sales and developing all sampled customer class load profiles based upon fraud and including the limited tax that it did pay in the electric rates of residential, secondary and primary customers, Consumers Energy is depriving the United States Federal government out of legitimate tax revenue, and Defendant Consumers Energy has impeded the ability of the Federal Energy Regulatory Commission (FERC) to regulate more efficiently and to expand the reliability of the electric grid.

245.   At a tax rate of 35% Consumers Energy has defrauded the IRS (Plaintiff the United States Government) of more than $200 Million for the year 2009, $250 Million for the year 2010, and approximately $250 Million for the year 2011, and it

is expected that the fraud in the year 2012 is approximately $250 Million, however Defendants have not yet published their financial reports for the year 2012.

246.   Thus, for the years 2007 through 2012 combined, using an extremely conservative estimate considering only the overstated costs of purchased power shows that Consumers Energy has defrauded Plaintiff, the United States Government out of $1 Billion in U. S. federal income taxes.  (Plaintiff Anderson did not have the purchase power expense information to determine the fraud amounts for the years 2007 and 2008, however fraud did occur in those years, as Plaintiff Anderson is aware as he reviewed the LOAD DATA of Defendants for the years 2007 through 2011).

**MONETARY AMOUNT OF FRAUD BY DEFENDANTS AGAINST PLAINTIFF SIMEON ANDERSON AND THE CLASS OF PLAINTIFFS**

247.   For purchased power alone in the years 2008, 2009, and 2010, Consumers Energy has defrauded its rate payers (Plaintiff Simeon Anderson and the Class of Plaintiffs in this lawsuit) out of more than $3 billion.

## COUNT III

## FRAUD AGAINST THE STATE OF MICHIGAN

**ALSO, MONETARY AMOUNT OF FRAUD BY DEFENDANTS AGAINST PLAINTIFF THE STATE OF MICHIGAN**

248.   Plaintiffs re-allege and incorporate Paragraphs 1 through 247 as though set forth in full word for word and paragraph for paragraph.

249. Defendants have committed fraud upon the State of Michigan as plead herein, and pursuant to the legal cites herein, and other applicable law.

250. For the state of Michigan citizens, LIEEF (Low Income Energy Efficiency Fund) funding is provided to Consumers Energy for low income customer electricity bill payments.

251. Based upon 2010 estimates, Consumers Energy has collected more than $50 Million with this LIEEF (Low Income Energy Efficiency Fund) program.

252. Using 60 % as a guide for the portion of fraud built into the rates by Consumers Energy, Consumers Energy has defrauded the Plaintiff, State of Michigan out of more than $30 Million.

253. Given the total payout of more than $394 Million to all utilities in the state of Michigan, since the inception of this LIEEF (Low Income Energy Efficiency Fund) program, it is concluded that the fraud committed by Consumers Energy exceeds $75 Million.

254. Consumer Energy and/or it's Officers or Agents have violated MCL 205.27 which states, "(a) Fail or refuse to make a return or payment within the time specified, make a false or fraudulent return or payment, or make a false statement in a return                     or                     payment. (b) Aid, abet, or assist another in an attempt to evade the payment of a tax, or a part of a tax, or file a false claim for credit as provided in statutes administered under this act." MCL 205.27

255. The laws also holds, "Under § 15(2), M.C.L. § 205.65(2); M.S.A. § 7.536(2), if a corporation fails to file a return, or pay taxes due, personal tax liability may be imposed on the officers having control of, supervision of, or responsibility for the making of tax returns or payments." Detroit Hilton Ltd Pship v Dept of Treasury, Revenue Div, 422 Mich 422, 429; 373 NW2d 586, 588 (1985)

## COUNT IV
## CONVERSION

256. Plaintiffs re-allege and incorporate Paragraphs 1 through 255 as though set forth in full word for word and paragraph for paragraph.

257. Defendant by and through their agents, employees and co-conspirators has violated MCL 600.2919a, entitled: Stealing, embezzling, or converting property or buying, receiving, possessing, concealing, or aiding in concealment of stolen, embezzled, or converted property; recovery of treble damages, costs, and attorney fees; other rights or remedies.

258. Sec. 2919a. States:, "(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees: (a) Another person's stealing or embezzling property or converting property to the other person's own use." MCL 600.2919a.

259. Defendant received and/or aided in the acquisition and/or concealment of all Plaintiffs converted property as described within this Complaint.

260. Defendant's agents, employees and co-conspirators have violated MCL 600.2919a.

261. Defendant's agents, employees and co-conspirators received and/or aided in the acquisition and/or concealment of all Plaintiffs converted property as described herein.

262. Defendant wrongfully concealed information, regarding or concerning the status of all Plaintiffs' property as described within this Complaint.

263. Defendant's agents, employees and co-conspirators wrongfully concealed information, regarding or concerning the status of all Plaintiffs' property as described within this Complaint.

264. Defendant did wrongfully exert dominion and control over all Plaintiffs' money/property by paying their agents, employees, co-conspirators and stock and/or shareholders with those converted funds.

**COUNT V**

**CLASS ACTION ALLEGATIONS**

265. Plaintiffs re-allege and incorporate Paragraphs 1 through 264 as though set forth in full word for word and paragraph for paragraph.

266. Plaintiff Simeon Anderson also brings this lawsuit as a class action.

267. The nature of the action is that Defendant Consumers Energy has defrauded it's customers (the Class) for years, as plead herein, along with defrauding the State of Michigan and the U. S. Federal government in order to profit monetarily.

268. The issues here will be whether or not Defendants and Defendant Consumers Energy did in fact defraud their customers (the Class) for monetary gain, and the amount of that monetary gain that is attributed to that fraudulent behavior.

269. Plaintiff Simeon Anderson defines the Class as all individual and business customers of Consumers Energy for the years 2008 to present, and prior.

270. The Class is so numerous, totaling over one million customers of Consumers Energy, that joinder of all members is impracticable.

271. There are no individual questions.

272. Plaintiff Simeon Anderson will fairly and adequately protect the interests of the Class and is committed to vigorously litigating this matter.

273. Plaintiff Simeon Anderson previously worked for Defendant Consumers Energy and has spent thousands of hours determining that Defendant has committed fraud against and upon their customers (Plaintiff Class) for their own monetary gains.

274. In conjunction with all paragraphs herein, and specifically, paragraph 41 sections i, ii, iii, and iv contained herein, the portion of the damages perpetrated upon the Class by Defendants is as a result of the Defendants fraudulent double dipping.

275. Although Consumers Energy has defrauded the IRS out of legitimate tax revenue by overstating its expenses and effectively lowering its taxable income levels, and has thereby affected the entire federal regulatory system, including FERC, it also collects additional fraudulent revenue from the Class through higher electricity rates and possibly other related charges (other charges billed to the Class determined by Defandant's fraud as it relates to FERC and the MPSC) by including the cost of federal income taxes and/or state of Michigan taxes in the fraudulently increased rates of the respective electric customer classes (the Class), providing subject matter jurisdiction to this Court.

276. The Class was and is also defrauded by the Defendant company as it collected (collects) additional fraudulent revenue through penalties and charges assessed and provided through the FERC OATT as specified in paragraph 41 sections i, ii, iii, and iv contained herein, providing subject matter jurisdiction to this Court.

277. Plaintiff Simeon Anderson's claim is typical of the claims of the Class which arises from the same operative facts and based upon the same legal theories.

278. The claims or defenses of the representative parties are typical of the claims or defenses of the Class.

279. A class action is a superior method for the fair and efficient adjudication of this controversy.

280. In this case, the capacity of a classwide proceeding will generate common answers that are apt to drive the resolution of the litigation.

281. Pursuant to Federal Court Rule 23, "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class;or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;"

282. Upon knowledge, information and belief, the consumers in the Class except for Plaintiff Anderson, have no knowledge that they have been defrauded by Defendant Consumers Energy.

283. The interests of class members individually prosecuting separate claims against Defendant are small because maximum damage to each individual equates on average to less than $1,000.00 per customer per year.

284. Certification of the class (individual and business customers of Consumers Energy) under Federal Rules of Civil Procedure 23(a) and (b)(3) is appropriate because (a) the questions of law and fact common to the members of each class predominate over any questions affecting an individual member, and (b) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

285.   Certification of the Class in this lawsuit is appropriate, and Plaintiff Simeon Anderson requests class certification.

286.   Plaintiff's attorney Raymond Guzall III was previously involved as a defense attorney representing Midwest Audit Services in the class action lawsuit filed against Defendant Consumer's Energy, case number 09-cv-14740, filed within this Court by Plaintiff Kayla South.

287.   Plaintiff's attorney Raymond Guzall III has spent well over one hundred hours on the issues and facts stated herein in identifying and investigating potential claims, and preparing to litigate this matter.

288.   Plaintiff's attorney Raymond Guzall III has had several conversations with attorneys for the State of Michigan attorney general's office and for the Michigan Public Service Commission (MPSC) prior to filing this lawsuit.

289.   Plaintiff's attorney Raymond Guzall III has appeared before the MPSC in representing Simeon Anderson as to his recent Complaint to the MPSC.

290.   Plaintiff's attorney Raymond Guzall III was told by attorneys for the State of Michigan and Consumers Energy that the MPSC was not the appropriate forum to litigate past and current damages of Consumers Energy employees, and that the MPSC could only deal with altering future rates.

291.   Jurisdiction is appropriate in this Court pursuant to the federal claims alleged by Plaintiffs herein, and based upon the subject matter as stated herein.

292. This court is the proper forum and venue to litigate this matter as Consumers Energy does business within this Court's jurisdiction, which is also where numerous class members reside and do business in the State of Michigan.

293. A great number of the Class is located within this court's jurisdiction, connected by the business and residential business between each class member and Defendant Consumers Energy.

294. Plaintiff Anderson was also a customer of Consumers Energy during the time of Defendants fraud as stated herein, and therefore is part of the Plaintiff Class.

295. As a result of Defendants illegal acts as outlined and stated herein, Plaintiffs have been greatly damaged, in violation of the afore-stated causes of action,

296. The wrongful and illegal actions of Defendants have damaged, and continue to damage Plaintiffs as shown herein.

297. Plaintiffs have been damaged well in excess of the jurisdictional amount of $75,000.00.

WHEREFORE, your Plaintiff's, UNITED STATES OF AMERICA, ex rel SIMEON ANDERSON, SIMEON ANDERSON on behalf of himself and others similarly situated (Plaintiff CLASS), STATE OF MICHIGAN and ex rel SIMEON ANDERSON SIMEON ANDERSON, pray for judgment against Defendant, CONSUMERS ENERGY COMPANY, DIANE Y. BOWER in her individual and official capacity, ERIC KEATON in his individual and official capacity HUBERT MILLER in his individual and official

113

capacity WAYNE LEJA in his individual and official capacity STEVE STUBLESKI in his individual and official capacity, MICHAEL TORREY in his individual and official capacity, JAMES FRAGA in his individual and official capacity, ANNE ROGUS in her individual and official capacity and CURT PUCKETT in his individual and official capacity jointly and severally in an amount well in excess of the jurisdictional amount of $75,000.00, plus costs and interest, including past, current and future damages, exemplary damages and/or punitive damages, and attorney fees for the illegal acts of Defendant as stated herein, along with all other damages afforded by law.   Plaintiffs further requests all other relief the Court deems appropriate.

The facts as stated within this Verified Complaint are true to the best of my knowledge, information and belief, and I will testify so in court.

_____
Simeon Anderson

**JURY DEMAND**

Plaintiffs demand trial by jury in this matter.

Respectfully submitted,
RAYMOND GUZALL III, P.C.

_____
RAYMOND GUZALL III (P60980)
Attorney for Plaintiff Anderson, UNITED
STATES OF AMERICA, ex rel SIMEON
ANDERSON, STATE OF MICHIGAN and ex
rel SIMEON ANDERSON and Class
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248) 702-6122

Dated: February 15, 2013

114

# EXHIBIT 1

## Who Participated in Fraud and Coverup

| Person | Position | | Fraud |
|---|---|---|---|
| John G. Russel | President and Chief Executive Officer | Eric Keaton says Board decides how fraud is developed | create fraud and cover up |
| Thomas J. Webb | Executive Vice President and Chief Financial Officer | " " | create fraud and cover up |
| James F. Brunner | Senior Vice President and General Counsel | | create fraud and cover up |
| John M. Butler | Senior Vice President | " " | create fraud and cover up |
| David G. Mengebier | Senior Vice President and Chief Compliance Officer | " " | create fraud and cover up |
| Jackson. L. Hanson | Senior Vice President | | create fraud and cover up |
| Daniel J. Malone | Senior Vice President, Energy Delivery | | create fraud and cover up |
| Glenn P. Barba | Vice President, Controller and Chief Accounting Officer | " " | create fraud and cover up |
| Mamatha Chamarthi | Vice President and Chief Information Officer | " " | create fraud and cover up |
| Venkat Dheeruvakonda (DV) Rao | Vice President and Treasurer | " + responsible for maintain proper data and backup for corporation | create fraud and cover up |
| Catherine M. Reynolds | Vice President, Deputy General Counsel and Corporate Secretary | " " | create fraud and cover up |
| Dennis D. Dobbs | Vice President | " " | create fraud and cover up |
| Richard J. Ford | Vice President | | create fraud and cover up |
| Michele A. Kirkland | Vice President | | create fraud and cover up |
| James P. Pomaranski | Vice President | | create fraud and cover up |
| Patricia R. Poppe | Vice President | | create fraud and cover up |
| Ronn J. Rasmussen | Vice President | | create fraud and cover up |
| Jon R. Robinson | Vice President and Deputy General Counsel | Rates and Regulation division VP oversaw implementation and -> | create fraud and cover up |
| Garrick J. Rochow | Vice President | " " | create fraud and cover up |
| Timothy J. Sparks | Vice President | " " | create fraud and cover up |
| Theodore J. Vogel | Vice President and Chief Tax Counsel | " oversaw Purchased Power and Fuels (?) | create fraud and cover up |
| Michael A Torrey | Rates and Regulation Division Director | Implement fraud and coverup | create fraud and cover up |
| Stephen P Stubleski | Rates and Regulation Division – Cost of Service (COS) and Pricing Supvsr | Implement fraud and coverup | |
| Anne K. Rogus | Rates and Regulation Division – Revenue Requirements Supvsr | Implement fraud and coverup | |
| Lisa Gustafson | Government Relations – Supervisor | Implement fraud and coverup | |
| Daniel L Harry | Rates and Regulation Division – Forecasting Supvsr | Implement fraud and coverup | |
| Larner, Curtis J | Rates and Regulation Division – Budgeting Supvsr | Implement fraud and coverup | |
| Rachel Brege | Rates and Regulation – Tariffs Supvsr | Complicit | |
| Janice M Hoffman | Rates and Regulation – budgeting analyst | Implement fraud and coverup | |
| Eric J Keaton | Cost of Service Senior Analyst– GO TO GUY | Complicit | |
| Wayne M Leja | THE GO TO GUY FOR RATES AND REGULATION and other departments | Implement fraud and coverup | |
| Antonette Noakes | Tariff analyst | Implement fraud and coverup, create financial models | |
| Laura M Collins | Revenue Requirements  Purchased Power and fuel statistics | Complicit | create fraud and cover up |
| Fagg, James R (Jim) | Revenue Requirements Senior Analyst – GO TO GUY | Implement fraud and coverup | |
| Miller, Hubert W | Pricing Analyst – GO TO GUY | Implement fraud and coverup | |
| Onnen, Tracy D | Budgeting Senior Analyst | Implement fraud and coverup | |
| Rolling, Erin A | Revenue Requirements Analyst | Complicit | |
| Ruhl, Benjamin M (Ben) | Pricing Analyst – GO TO GUY (25+ years in department) | Complicit | |
| Scheffel, Phyllis A | Pricing Analyst - 25+ years in department | Implement fraud and coverup | |
| Warriner, Lincoln D | Budgeting – Lead | Complicit | |
| James Anderson | Fuel/Purchased Power Department (?) | Implement fraud and coverup | |
| David Ronk | Fuel/Purchased Power Department (?) | Implement fraud and coverup | |
| Andrew Denatto | Finance | Implement fraud and coverup | |
| Anthony Parker | Financial Analyst | Complicit | |
| John Strzalka | SAP programmer (?) division lead (?) | Implement fraud and coverup with data | |
| Attorney Bob Neustifter | Attorney | Implement fraud and coverup | |
| Terrence Mierswa | Marketing Energy Optimization | Implement fraud and coverup | |
| Kimberly Mitchner | Programmer Information Systems | Implement fraud and coverup | |
| Charles Belknap | Former Load Research Supervisor | | |
| Timothy Wallbaum | Programmer Information Systems | Implement fraud and coverup | |
| Stephen Hirsch | SAP – Data lead supervisor , load research formerly | Implement fraud and coverup in Data dept and Load research | |
| William Ware | Marketing, Company Statistician | Implement fraud and coverup | |